828 F.2d 340
 14 Media L. Rep. 1417
 Applications of NATIONAL BROADCASTING COMPANY, INC. and
WKYC-TV3, Intervenors-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jackie PRESSER, Harold Friedman and Anthony Hughes,
Defendants-Appellees.
 No. 86-3735.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 2, 1987.
Decided July 31, 1987.
 
 Stephen H. Jigger, Bernard A. Smith, Cleveland, Ohio, for U.S.
 Michael L. Climaco, John R. Climaco, Paul Lefkowitz (argued), Roger M. Synenberg, Climaco, Climaco, Seminatore, Lefkowitz & Garofili, Cleveland, Ohio, for Hughes and Presser.
 Terence J. Clark (argued), Michael E. Brittain, Joseph A. Castrodale, Calfee, Halter & Griswold, Cleveland, Ohio, for intervenors-appellants.
 Robert J. Rotatori, Susan Gragel, Cleveland, Ohio, for Friedman.
 Before LIVELY, Chief Judge, RYAN, Circuit Judge, and JOINER, District Judge.*
 LIVELY, Chief Judge.
 
 
 1
 This is one of two appeals now before this court arising from preliminary proceedings in the prosecution of Jackie Presser, the president, and two other officials of the Teamsters Union. Neither appeal involves matters directly related to the question of the guilt or innocence of the defendants. The appellants in both cases seek media access to the sealed records of certain pretrial proceedings that were conducted in camera by the district court. The companion case is No. 86-3656, in which Storer Communications, Inc. and WJW-TV8 are the appellants (the Storer appeal), decided this date.
 
 I.
 A.
 
 2
 Following the May 16, 1986 indictment of the defendants on charges of embezzling union funds, their case was assigned to United States District Judge Ann Aldrich by blind draw. John Climaco, the attorney for defendant Presser, wrote Judge Aldrich, suggesting that she recuse herself in view of a longstanding quarrel between Judge Aldrich and himself. Judge Aldrich did not comply with the request, but did refer it to the judge of the district court handling miscellaneous matters, Honorable George W. White. This procedure had been suggested by this court in an unpublished opinion in an unrelated case in which another of Climaco's clients had appealed Judge Aldrich's denial of a motion to disqualify herself.
 
 
 3
 On June 3 (all dates refer to 1986 unless otherwise indicated) John Climaco filed a motion under seal with Judge White to disqualify Judge Aldrich pursuant to 28 U.S.C. Secs. 144 and 455. The motion requested that proceedings thereon be conducted in camera. The motion was accompanied by a memorandum in support and a motion that the memorandum be filed under seal. A similar motion and memorandum were filed by Michael Climaco on behalf of the defendant Anthony Hughes--also under seal. Michael Climaco is the brother of John Climaco and both are members of the same law firm. Following a hearing on June 4 Judge White filed a memorandum in which he found that Judge Aldrich should be disqualified "under the circumstances" and in view of the affidavits of Presser and Hughes alleging a lack of impartiality growing out of differences between the judge and their attorneys. On June 5 Judge White entered an order returning the case to the clerk of court for reassignment and deferring the matter of unsealing the record. The National Broadcasting Company and WKYC-TV3 (hereafter NBC) had filed an application the same date, June 5, to be permitted to secure copies of all the documents related to the disqualification issue.
 
 B.
 
 4
 On June 13, attorneys for the Department of Justice filed a motion for inquiry concerning conflicts of interest faced by the attorneys for the three defendants. On June 16, Presser filed a motion to place the government's June 13 motion and accompanying documents under seal on the ground that they would generate additional prejudicial pretrial publicity. This motion and a supporting memorandum were also filed under seal. On June 20 NBC filed an application to receive copies of all documents related to the inquiry concerning conflicts of interest. On June 23 Judge White, to whom the case had now been assigned for trial, issued an order that all documents related to the inquiry would remain under seal until further order of court. Both Presser and Hughes filed memoranda, under seal, in opposition to NBC's applications for access and Presser filed a motion, under seal, to place all documents related to the conflicts inquiry under seal.
 
 
 5
 The district court held a hearing in open court on June 26 at which the attorneys argued the legal issues raised by the various motions without discussing factual matters. At this hearing the attorney for the third defendant, Harold Friedman, also argued in favor of keeping all records pertaining to the motion for disqualification and the inquiry into conflicts of interest under seal. At the conclusion of the hearing the court denied NBC's application for access. The court found that the sealed documents seeking the disqualification of Judge Aldrich related "to matters which are not relevant to the culpability of the within defendants," but that their disclosure might cause potential jurors to become biased against the defendants. The district court also denied NBC's application for access to the documents pertaining to the conflicts inquiry. The court again found that these materiais have no bearing on the culpability of the defendants, but found further that their disclosure would make it "virtually impossible to impanel an impartial jury" and would create "far more than a 'reasonable probability of prejudice' to the defendants." The district court filed a memorandum and order on June 27, directing that all documents remain under seal, and providing that a transcript including all the materials in question would be made available for public inspection after the trial, when "the danger of prejudice will have passed."
 
 C.
 
 6
 On July 3 NBC filed a motion for reconsideration of the rulings on both applications. The court held in camera hearings on July 10 and 11 on the conflicts issue and obtained waivers on the record from each defendant of any claim of prejudicial error arising out of conflicts of interest involving their attorneys. On July 22 the district court filed a memorandum and order denying NBC's motion for reconsideration. In its memorandum the court analyzed the Supreme Court's decision in Press-Enterprise Co. v. Superior Court of California, --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1, decided June 30, 1986, and concluded that NBC had not satisfied a "two-pronged test" set forth by the Court to establish a qualified right of access to the principal materials sought. The order did release from seal NBC's applications, the memoranda and briefs in support and in opposition to the applications and various responses. What remained under seal were the defendants' motions to disqualify Judge Aldrich with all supporting documents, the government's motion for inquiry into conflicts with all supporting documents and the materials filed in response thereto by the defendants, and the transcripts of all in camera hearings and meetings.
 
 
 7
 The district court's July 22 memorandum concluded:
 
 
 8
 Because Presser is entitled to a fair trial, Presser's right to a fair trial supersedes the public's right of access, Press-Enterprise Company v. Superior Court, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the publicity generated by the media has already created a high level of prejudicial pre-trial publicity such that there exists a "substantial probability" that Presser's right to fair trial will be prejudiced by further publicity generated in connection with the release of information regarding the disqualification of the Honorable Ann Aldrich and the pleading filed by the United States of America seeking a court inquiry into various alleged conflicts of interest, there exists no reasonable alternative to closure other than a release of such information and materials after the conclusion of the trial on the merits.
 
 
 9
 For the foregoing reasons and for the reasons stated in the Court's previous order, NBC and WKYC do not have a right of access to the information that they now seek by way of this motion for Reconsideration. The Motion for Reconsideration is DENIED.
 
 D.
 
 10
 NBC filed a timely notice of appeal from the district court order formally sealing the various documents and from the orders denying its application for access and denying its motion for reconsideration. Although all of these orders are interlocutory with respect to the underlying case, we have jurisdiction of this appeal pursuant to 28 U.S.C. Sec. 1291. NBC was permitted to intervene in the district court, and the orders satisfy the "collateral order doctrine" set forth in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). See Application of The Herald Co., 734 F.2d 93, 96 (2d Cir.1984).
 
 II.
 A.
 
 11
 This is not a prior restraint case. NBC is not restrained by the district court's order from publishing or broadcasting documents or information in its possession. Rather, the case concerns the right of the public and representatives of "the media" to have access to documents filed in a district court at the preliminary stages of a criminal prosecution. The Supreme Court has decided a number of cases dealing with the right of access since 1979. See Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Press-Enterprise Co. v. Superior Court of California (Press Enterprise I), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); Press-Enterprise Co. v. Superior Court of California (Press Enterprise II), --- U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). Some of these decisions involve the explicit Sixth Amendment guarantee of an open trial, which may be invoked only by a defendant, Gannett, 443 U.S. at 379-80, 99 S.Ct. at 2905, while others involve the right of the public to attend criminal trials and the right of representatives of the media to be present at such trials, as implied in the First Amendment. Richmond Newspapers, 448 U.S. at 580, 100 S.Ct. at 2829 ("We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press would be eviscerated.' Branzburg, [v. Hayes], 408 U.S. 665 at 861, 92 S.Ct. at 2646, at 2656, 33 L.Ed.2d 626.") (Footnote omitted). This court recently affirmed its adherence to a policy of openness in judicial proceedings. Brown & Williamson Tobacco Corp. v. F.T.C., 710 F.2d 1165, 1176-81 (6th Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 127 (1984).
 
 
 12
 In Press-Enterprise I the Court held that the First Amendment guarantee of an open public trial extends to the jury selection process and found that an order closing the courtroom and sealing the entire transcript of voir dire proceedings infringed that right. In so ruling the Court held:
 
 
 13
 The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.
 
 
 14
 464 U.S. at 510, 104 S.Ct. at 824.
 
 
 15
 The Supreme Court dealt with the First Amendment right of access in preliminary criminal proceedings for the first time in Press-Enterprise II. (Gannett dealt with the Sixth Amendment right to an open suppression hearing; Press-Enterprise I appeared to treat jury selection as the beginning of the trial.) In Press-Enterprise II the Court identified two "complementary considerations" in determining whether there is a qualified right of access to preliminary criminal proceedings, and then prescribed the standards to be applied to a closure order if the threshold criteria are satisfied. The complementary considerations are whether there is "a tradition of accessibility" and whether public access "plays a significant positive role in the functioning of the particular process in question." 106 S.Ct. at 2740. There is a qualified right of public access if the particular preliminary proceeding "passes these tests of experience and logic." Id. 2741.
 
 B.
 
 16
 The district court concluded that proceedings on a motion to disqualify a judge and on a motion to inquire into attorney conflicts of interest passed neither of the Press-Enterprise II tests. Despite this finding, the district court went on to hold that the defendants' right to a fair trial prevailed over any qualified right of access that might exist. This is a determination which the Supreme Court described as one required in "limited circumstances" in which the right of an accused to a fair trial might be undermined by publicity. Id. at 2741. The Court further stated:
 
 
 17
 [T]he proceedings cannot be closed unless specific, on the record findings are made demonstrating that "closure is essential to preserve higher values and is narrowly tailored to serve that interest."
 
 
 18
 Id. at 2743. (Citation omitted). In further explication of the requirements for closure, the Supreme Court stated:
 
 
 19
 The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right [to a fair trial]. And any limitation " 'must be narrowly tailored to serve that interest.' " Press-Enterprise, supra, 464 U.S. at 510, 104 S.Ct., at 824.
 
 
 20
 Id. at 2744.
 
 III.
 
 21
 We will deal with the disqualification and conflicts issues separately, treating disqualification first.
 
 A.
 
 22
 The defendants filed the motions and affidavits of bias against Judge Aldrich pursuant to 28 U.S.C. Sec. 144 and referred therein to 28 U.S.C. Sec. 455 which sets forth the circumstances under which a judge must disqualify himself. Section 144 neither provides nor hints that the motion or affidavit should be sealed or that disqualification hearings should be closed. The fact that a judge is not required to give a reason for recusal is beside the point. Often judges recuse themselves sua sponte. In such a case there is no record; the judge withdraws for reasons that he or she considers sufficient. However, when a judge is disqualified as the result of an affidavit of bias, there is a record, and we believe the public is entitled to access. We know of no tradition that hearings on motions to disqualify for bias are closed and that all documents pertaining to such motions are sealed. To the contrary, such proceedings are usually held in open court, and even when the judge recuses himself, he usually puts a statement on the record disclaiming any bias and stating that he removes himself in order to permit the case to proceed without the distraction of a controversy related to the judge.
 
 
 23
 We have surveyed reported Sixth Circuit cases involving the disqualification of judges from 1924 to 1984 and have not found one in which the proceedings were closed or the record sealed. See Saunders v. Piggly Wiggly Corp., 1 F.2d 582 (W.D.Tenn.1924); Crowder v. Conlan, 740 F.2d 447 (6th Cir.1984), and cases cited in annotation to 28 U.S.C. Sec. 144. A case involving an attempt to disqualify a judge for alleged antipathy toward an attorney was decided on an open record in Gilbert v. City of Little Rock, Ark., 722 F.2d 1390 (8th Cir.1983). We believe there is clearly a tradition of accessibility to disqualification proceedings.
 
 
 24
 We also believe that disqualification proceedings pursuant to a motion of one or more parties satisfy the second Press-Enterprise II consideration--public access does play "a significant positive role" in such proceedings. As the court stated in United States v. Chagra, 701 F.2d 354, 363 (5th Cir.1983), quoting United States v. Criden, 675 F.2d 550, 556 (3d Cir.1982), "The first amendment right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the judicial system." The background, experience, and associations of the judge are important factors in any trial. When a judge's impartiality is questioned it strengthens the judicial process for the public to be informed of how the issue is approached and decided.
 
 
 25
 We conclude that both threshold criteria were satisfied and that there is a qualified right of access to documents and records that pertain to a proceeding in which one or more parties seek to disqualify a judge for bias pursuant to 28 U.S.C. Sec. 144. We emphasize that this ruling does not require a judge to make any record when he or she recuses sua sponte.
 
 B.
 
 26
 The government's motion for an inquiry into attorney conflicts in interest was filed, at least in part, pursuant to Rule 44(c), Fed.R.Crim.P., which provides:
 
 
 27
 (c) Joint Representation. Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.
 
 
 28
 Of the many decisions cited in the Notes of the Advisory Committee, only United States v. Foster, 469 F.2d 1 (1st Cir.1972), suggests that inquiries into possible conflicts should be conducted as closed proceedings. In Foster the court stated:
 
 
 29
 There may be unusual circumstances where, to avoid the possibility of prejudicial disclosures to the prosecution, the court may exercise its discretion to pursue the inquiry with defendants and their counsel on the record but in chambers.
 
 
 30
 Id. at 5. The reference to "unusual circumstances" indicates to us that in the ordinary case inquiries into conflicts of interest by attorneys should be held in open court, and that this is the traditional method of conducting such inquiries.
 
 
 31
 We also conclude that there is a significant positive role to be played by having such proceedings conducted in open court. From such proceedings the public is informed of the seriousness with which the Sixth Amendment right to counsel is treated and of the meticulous inquiries that are undertaken by the court to be certain that defendants understand their right to independent counsel with undivided loyalty to the client's cause.
 
 
 32
 Thus, as with the disqualification issue, we conclude that proceedings inquiring into conflicts of interest by attorneys meet and satisfy the requirements of a qualified First Amendment right of access. Although not "like a trial," in the sense of a preliminary hearing such as the court considered in Press-Enterprise II, both proceedings do require the court to make factual determinations and to apply settled legal principles in order to rule. In addition, resolution of the issues presented in both types of proceedings, has a significant bearing on all subsequent proceedings in a case, particularly on the trial itself.
 
 IV.
 A.
 
 33
 Having determined that there is a qualified right of access to the materials, our next inquiry is whether this case presents those "limited circumstances in which the right of the accused to a fair trial might be undermined by publicity." Press-Enterprise II, 106 S.Ct. at 2741 (footnote omitted). The district court held that the materials submitted in both proceedings would engender publicity that would be prejudicial to the defendants' right to a fair trial. The court also stated that no alternative to sealing existed that would preserve the defendants' rights. We do not believe that the district court's findings satisfy the requirements set out in Press-Enterprise II. While the district court used the language of that opinion, it did so in a conclusory manner. It did not make "specific findings ... demonstrating that " there was substantial probability that the defendants' right to a fair trial would be prejudiced by further publicity and that reasonable alternatives to closure cannot adequately protect that right. Id. at 2743 (emphasis added). The conclusions that these are the conditions in this case are not supported by any specific findings "demonstrating" that this result would follow from unsealing the materials.
 
 
 34
 NBC urges us to conduct an independent appellate review since the entire record is before us. However, we believe the required findings should be made first by the district court, which has lived with this case for months and is familiar with all the issues. However, we do set forth some guidelines to be followed in making the determination.
 
 B.
 
 35
 At the urging of Presser's attorney the district court appears to have concluded that all publicity is prejudicial to a defendant's right to a fair trial. This assumption is not tenable. As the Supreme Court emphasized in Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 565, 96 S.Ct. 2791, 2805, 49 L.Ed.2d 683 (1976), "pretrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically in every kind of criminal case to an unfair trial." Few cases in recent years have attracted such massive media attention as the California prosecution of John DeLorean for alleged violation of federal narcotics laws. In response to the wide press coverage, during the pretrial period, the trial judge ordered all documents to be filed in camera and sealed. The Court of Appeals found that this order violated the public's First Amendment right of access and ordered the records unsealed unless "sufficiently specific" findings were made on a "document-by-document basis." Associated Press v. United States District Court, 705 F.2d 1143, 1147 (9th Cir.1983). The media coverage, much of it negative, continued. It even included the broadcast of video tapes made by the government during its investigation of DeLorean. Yet, in the end, the jury acquitted this highly-publicized defendant.
 
 
 36
 It is significant that voir dire in some of the most widely covered criminal prosecutions has revealed the fact that many prospective jurors do not follow such news closely and that juries can be empanelled without inordinate difficulty. E.g., United States v. Myers, 635 F.2d 945, 948 (2d Cir.1980) (Abscam); United States v. Mitchell, 551 F.2d 1252, 1262 n. 46 (D.C.Cir.1976), rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (Watergate). As the court noted in a different Watergate prosecution, "[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less than fascinating to the public generally." United States v. Haldeman, 559 F.2d 31, 62-63 n. 37 (D.C.Cir.1976) (en banc).
 
 
 37
 In the present case the materials submitted in support of the motion to disqualify Judge Aldrich do not relate to the defendants in any way, much less do they bear on the guilt or innocence of the defendants on the charges in this case. These materials concern a longstanding public feud between Judge Aldrich and members of the law firm representing Presser and Hughes. Much of the material consists of press accounts of charges and counter-charges over a three-year period. It is difficult to see how a rehash of these materials will lead to the deprivation of the defendants' right to a fair trial. Any order continuing these materials under seal must be extremely narrowly tailored.
 
 
 38
 The materials related to the alleged attorney conflicts of interest present some different considerations. To the extent that these materials concern attorneys in the case rather than the defendants, they resemble those filed with the motion to disqualify Judge Aldrich. Insofar as the motion seeks to point out the danger of conflict and prejudice from dual representation, it calls for Rule 44(c) proceedings which should be unsealed. The materials contain nothing of a derogatory or unusual nature. Other materials submitted in connection with this inquiry appear to require closer scrutiny. The district court will reconsider these materials and if it concludes again that their unsealing will create publicity that has a substantial likelihood of prejudicing the defendants' right to a fair trial, it will make specific findings demonstrating why this is so and will enter an order tailored as narrowly as possible to avoid this result. In addition to demonstrating a substantial likelihood of prejudice, the findings must also demonstrate that no alternatives can adequately protect the right to a fair trial and that closure will be effective to achieve this protection. See Associated Press v. United States District Court, 705 F.2d at 1146; United States v. Chagra, 701 F.2d at 365.
 
 V.
 
 39
 This court is keenly aware of the difficulties encountered by district judges in dealing with highly-publicized cases, and we have no desire to add to those difficulties. Judge White has displayed patience and extreme care in all aspects of this particular case. The work of judges is never easy when two constitutional protections come into conflict in a given case. In Press-Enterprise II the Supreme Court remarked on the necessity for all courts "to remember that these interests are not necessarily inconsistent. Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers." 106 S.Ct. at 2740. We believe the standards defined by the Supreme Court and applied by various courts of appeals, as noted herein, provide the necessary framework for reconciling conflicts between the First Amendment right of access and the Sixth Amendment guarantee of a fair trial.
 
 
 40
 Openness in judicial proceedings promotes public confidence in the courts. The Supreme Court has pointed out that openness has been a principle that accompanied the long evolution of proceedings culminating in the modern criminal trial. Richmond Newspapers, Inc. v. Virginia, 448 U.S. at 564-75, 100 S.Ct. at 2820-26. One feature of that evolution has been the increasing importance of pretrial proceedings. The Supreme Court has recognized that the importance of some pretrial proceedings dictates that the rule of openness not be confined to the actual trial. Press-Enterprise II. By extending the presumption of a right of access to the particular proceedings involved in this and the Storer appeal, and requiring strict compliance with the requirements for overcoming that presumption, we do no more than acknowledge the critical importance of a core ingredient of the American judicial system.
 
 
 41
 The orders appealed from are vacated, and the cause is remanded for further proceedings consistent with this opinion. The documents sealed by the district court will remain sealed until that court has an opportunity to carry out the remand in an expeditious manner.
 
 
 42
 RYAN, Circuit Judge, dissenting.
 
 
 43
 In my judgment the court's conclusion that the public, including the media, has a first amendment constitutional "qualified right of access to [the] documents" in question in this case and the right to be present at the court's hearings on the motions to recuse Judge Aldrich and to inquire into the claims of attorney conflict of interest is mistaken. The language of the first amendment of the federal Constitution provides no such right, and no authoritative judicial construction of the Constitution cited by the court, or of which I am aware, suggests one.
 
 
 44
 In candor, I must confess that the court's precise holding is not entirely clear to me. It appears to announce two specific holdings in Part III, the dispositive part of the opinion:
 
 
 45
 1. That there is a first amendment "qualified right of access to documents and records that pertain to a proceeding in which one or more parties seek to disqualify a judge for bias pursuant to 28 U.S.C. Sec. 144." Maj. op. Part III A (emphasis added);
 
 
 46
 and,
 
 
 47
 2. That there is "a qualified First Amendment right of access" to "proceedings inquiring into conflicts of interest by attorneys ..." Maj. op. Part III B (emphasis added).
 
 
 48
 Thus, as to the motion to disqualify Judge Aldrich, the court specifically holds that NBC has a qualified first amendment constitutional right of access to the "documents and records," by which presumably is meant the motion papers, relating to the recusal request. But, before reaching that conclusion, the court states: "We believe there is clearly a tradition of accessibility to disqualification proceedings." (Emphasis added.) Then, in Part III B of its opinion, after addressing the motion concerning the alleged conflict of interest by the defense attorneys, the court specifically holds that, "as with the disqualification issue, we conclude that proceedings inquiring into conflicts of interest by attorneys meet and satisfy the requirements of a qualified First Amendment right of access." (Emphasis added.)
 
 
 49
 It may be that I read the court's specific holding too narrowly, and should recognize that the court has found a qualified first amendment right in the public, including the press, to read and obtain copies of all the motion papers in both the disqualification and the conflict of interest matters, and, in addition, to be present at the hearings, in open court, in which those motions are presented. I will assume that to be the court's holding, and from it, I dissent.
 
 I.
 
 50
 The issue of NBC's claimed constitutional right to examine and copy the motion papers in support of both motions is, analytically, wholly distinct from the claim of a constitutional right to be present at the hearings at which those motions were presented and decided, or in lieu thereof, to have access to the hearing transcripts.[1] The former has to do with access to court documents, and the latter with the right to be present at proceedings held in open court. The court relies on the same precedential authority for both constitutional entitlements, however, and appears to treat the two subjects as constitutionally fungible.
 
 
 51
 In my view, nothing in the language of the first amendment of the United States Constitution, or in any authoritative interpretation of it of which I am aware, provides either that the motion papers involved here must be made available to the public, including the media, or that the public has a right to be present at hearings on such motions. Because they are separate issues, I shall address them separately, beginning with the appellant's claim of a constitutional right of access to the documents on file relating to the motions. I am satisfied it is appropriate to treat the claimed right of access to the motion papers in the two motions as one issue, since there is nothing in the substance of the motions or the relief sought that would distinguish them from one another for purposes of a constitutional right of access.
 
 A.
 Access to Documents
 
 52
 The court rests its conclusion primarily upon Press-Enterprise Co. v. Superior Court of California, 478 U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II ). To put it plainly, that case has nothing to do with documents of any kind; it has to do with a claimed constitutional right to be present at a state preliminary hearing in a multiple murder case.[2] Moreover, as discussed in subpart B hereof, the case provides no authority for The National Broadcasting Company's (NBC) claimed right to attend the motion hearing in this case, or, alternatively, to have access to the transcript of the hearings.
 
 
 53
 In Part II A of its opinion, the court correctly states the first issue in this case:
 
 
 54
 "Rather, [this] case concerns the right of the public and representatives of 'the media' to have access to documents filed in a district court at the preliminary stages of a criminal prosecution."
 
 
 55
 Maj. op. at 343. After citing the six leading Supreme Court decisions concerning the right of the press and public to be in attendance at various phases of criminal case proceedings[3], and correctly recognizing that those cases deal with the right of the public and media to attend criminal trials, Richmond Newspapers, including the juror selection process, Press-Enterprise I, and a state murder case preliminary hearing, Press-Enterprise II, the court focuses upon Press-Enterprise II and the two "complementary considerations" identified by Chief Justice Burger as comprising the test for determining, in that case, whether the press and public enjoyed a first amendment qualified right to attend the preliminary hearing:
 
 
 56
 1) "whether the place and process has historically been open to the press and general public," and 2) "whether public access plays a significant positive role in the functioning of the particular process in question."
 
 
 57
 478 U.S. at ----, 106 S.Ct. at 2740, 92 L.Ed.2d at 10. After declaring that it knows of "no tradition that hearings on motions to disqualify for bias are closed and that all documents pertaining to such motions are sealed," and that it believes that "there is clearly a tradition of accessibility to disqualification proceedings " (emphasis added), the majority announces its holding:
 
 
 58
 "We conclude that both threshold criteria were satisfied and that there is a qualified right to access to documents and records that pertain to a proceeding in which one or more parties seek to disqualify a judge for bias pursuant to 28 U.S.C. Sec. 144."
 
 
 59
 478 U.S. at ----, 106 S.Ct. at 2739-40, 92 L.Ed.2d at 8-9 (emphasis added). Nowhere in the court's discussion of the cited Supreme Court cases, or elsewhere, is any analysis undertaken concerning the stated issue: the "right of the public and ... 'the media' to have access to documents filed in a district court at the preliminary stages of a criminal prosecution" (emphasis added), nor are any cases cited suggesting that such a right exists. Rather, from the premise that there is "clearly a tradition of accessibility to disqualification proceedings " (emphasis added), the court leaps to the conclusion that there is a first amendment qualified right of access to the materials and documents filed in connection with the motion. The Supreme Court has never held that there is a first amendment right of access to court documents and records, and has been explicit, that such a right of access, if it exists at all, is derived from the common law. Nixon v. Warner Communications, 435 U.S. 589, 597-99, 608-10, 98 S.Ct. 1306, 1311-12, 1317-18, 55 L.Ed.2d 570 (1978).
 
 
 60
 "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents....
 
 
 61
 "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes....
 
 
 62
 "It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case....
 
 
 63
 * * *
 
 
 64
 * * *
 
 
 65
 "Respondents argue that release of the tapes is required by both the First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of a public trial. Neither supports respondents' conclusion.
 
 
 66
 * * *
 
 
 67
 * * *
 
 
 68
 "The First Amendment generally grants the press no right to information about a trial superior to that of the general public. 'Once beyond the confines of the courthouse, a news gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public.' [citations omitted].
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 "[T]he guarantee of a public trial ... confers no special benefit on the press.... The requuirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed. ..."
 
 
 72
 Id. at 597-99, 608-10, 98 S.Ct. at 1311-12, 1317-18 (footnotes omitted, emphasis added).
 
 
 73
 It is not as though it has never occurred to the Supreme Court that there is a very significant difference between a first amendment right of access to court documents such as pleadings, affidavits, exhibits, and motion papers, and a first amendment right to attend courtroom proceedings. If the Court's appreciation of that difference were not self-evident from its decisions, Justice Stevens has repeatedly brought the matter to his colleagues' attention, and as recently as Press-Enterprise II. In his dissenting opinion in that case, and indeed, in his separate opinions in Press-Enterprise I, Richmond Newspapers and Globe, all cited by the court today, Justice Stevens discussed his long held belief that the press and public enjoy a first amendment right of access to all information in the possession of the government, including court records. But the Supreme Court has not been willing to go that far, and has been most circumspect in its language, limiting the public's constitutional right of access in criminal case litigation to a right to attend criminal proceedings.[4] The right, the Court has said, is one to attend certain "places and process[es]" Press-Enterprise II, 478 U.S. at 2815, 106 S.Ct. at 2740, 92 L.Ed.2d at 10. It has never held that the right is one of access to documents in the court record relating to those proceedings.
 
 
 74
 Nor has any case been found in which the Supreme Court has equated the right to attend criminal proceedings with the right to examine and copy court documents relating to those proceedings. Indeed, in the two most analogous cases touching the subject, the Court has held that the press has no first amendment right to inspect and copy parts of a judicial record. See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). In Seattle Times the Court held that the press had no first amendment right to publish information generated through pretrial depositions and interrogatories, which had been filed in the court record and sealed under a protective order, even though the press was itself a party to the litigation. The Court observed: "to the extent that courthouse records could serve as a source of public information, access to that source customarily is subject to the control of the trial court." Seattle Times, 467 U.S. at 33-34 n. 19, 104 S.Ct. at 2207 n. 19.
 
 
 75
 In Nixon v. Warner Communications, a broadcaster claimed a first amendment right of access to tape recordings of conversations recorded by President Nixon in his office, which were admitted into evidence and played aloud at the criminal trial of third persons. The press claimed a constitutional right to copy, broadcast and sell the tape recordings. The Court held that neither the sixth amendment right to a public trial--which is analogous to the first amendment right of the public to attend the trial--nor the first amendment guarantee of a free press reach the court's records and that there is no constitutional right in the public or the press to inspect and copy documents in the judicial record. 435 U.S. at 609-10, 98 S.Ct. at 1317-18. That right, the Court said, derives from the common law, not the Constitution.
 
 
 76
 Some courts have appeared to ignore or distinguish Seattle Times and Nixon, and have held that the first amendment right of access to criminal proceedings guarantees members of the media access to documents in the court's record that are relevant to those proceedings.[5] Of course, in those cases, the proceedings were open, and here they were not.
 
 
 77
 Other circuits appear to have followed the apparent mandate of Seattle Times and Nixon and have recognized a first amendment right in the public to attend trials but not to obtain copies of documents--ususally audio or video tapes--which were admitted into evidence.
 
 
 78
 Even if the decisions of those circuits finding a constitutional right of access to documents in the records of criminal cases were well-reasoned and persuasive, and to me they are not, this court is not free to follow them. We are bound to follow our own precedent as announced in United States v. Beckham, 789 F.2d 401 (6th Cir.1986), in which this court held that the public enjoys no first amendment right to inspect and copy judicial records or documents--tape recordings, transcripts thereof, or business contracts--which had been admitted into evidence. Any such right, this court has said, rests in the common law.[6]
 
 
 79
 I hasten to emphasize that I recognize that Seattle Times, Nixon and Beckham are distinguishable on their facts. They are instructive, however, in that they reveal the Supreme Court's and this court's appreciation that there is an important difference, for purposes of first amendment analysis, between a qualified right to attend certain court proceedings and a right to examine and copy court documents. They emphasize that the former is guaranteed by the first amendment and the latter, by the common-law.
 
 
 80
 Two propositions of importance emerge from all of this: 1) the Supreme Court authorities the court relies upon today in finding a first amendment right of access to the motion papers and the related court documents in this case, have nothing at all to say about a constitutional right of access to documents; they address instead, in every case cited, a qualified constitutional right to attend courtroom proceedings, and 2) the Supreme Court has carefully distinguished between a constitutional right of access to court documents, which it has rejected, and a first amendment right to attend courtroom proceedings, which it has recognized as a qualified right, enforceable in certain circumstances, and then only if carefully articulated threshold requirements are met.
 
 
 81
 I am satisfied that there is a strong common-law tradition in this country of public access to court records[7] and certain courtroom proceedings. That has ordinarily meant the press and public should have access to court documents, and in some circumstances, the right to copy them. But that tradition is in the common law, not the Constitution.
 
 
 82
 Nothing in the history, the text, or in a century and more of Supreme Court interpretation of the Bill of Rights suggests that the common-law tradition of public access to court records has been enshrined in the first amendment. The constitutionalizing of the common-law tradition of access to pre-trial motion papers is beyond this court's authority and today's effort to do so misapplies precedent and trivializes the first amendment.
 
 B.
 Access to the Proceedings
 
 83
 Press-Enterprise II, the principle basis for the court's conclusion that NBC has a first amendment qualified right to attend the motion hearings in this case, or as it turns out, to obtain a transcript of the hearings, is not authority for that conclusion, and, properly applied, commands the opposite conclusion.
 
 
 84
 To repeat, the Supreme Court declared in that case that the test for determining whether the public enjoys a qualified first amendment right to be present in a judicial proceeding in a criminal case is twofold: 1) "[W]hether the place and process has historically been open to the press and general public," and 2) "[W]hether public access plays a significant positive role in the functioning of the particular process in question." Neither of the two elements of the test are new. They had been identified by the Supreme Court in several earlier cases as "complementary considerations" for determining whether there is a first amendment right to be present at criminal proceedings. In applying the test to the facts presented in Richmond Newspapers and Globe, both access to criminal trial cases, and Press-Enterprise I, a jury selection case, the court found a qualified constitutional right to attend those proceedings. In Press-Enterprise II, before deciding that the "complementary considerations" guaranteed access to a pretrial proceeding like California's preliminary hearing, the Court examined each consideration separately. A close look at the Court's rationale suggests why the opposite conclusion should be reached in this case.
 
 
 85
 The first of the two considerations, "whether the place and process has been historically open to the press and general public" is derived, the Court said, from the pre-constitutional history of open criminal case trials in "the days before the Norman Conquest," the earlier English tradition of public trials, and the practice in colonial days of public trials of the "town meeting" sort. The historic roots of that "tradition of accessibility" to criminal trials extends likewise, the Court said, to preliminary hearings "as conducted in California:"
 
 
 86
 "Long ago in the celebrated trial of Aaron Burr for treason ... the probable cause hearing was held in the Hall of the House of Delegates in Virginia, the court room being too small to accommodate the crush of interested citizens.... From Burr until the present day, the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court."
 
 
 87
 478 U.S. at ----, 106 S.Ct. at 2471, 92 L.Ed.2d at 11 (citations omitted).
 
 
 88
 Thus, the Court concluded, like public criminal trials, the preliminary hearing "as conducted in California," has historically been open to the public.
 
 
 89
 After carefully analyzing the second of the two "complementary considerations," whether public access plays a significant role in the functioning of the California preliminary hearing, the Court concluded that it does--and the reason it does, the Court said, is because
 
 
 90
 "the preliminary hearing is often the final and most important step in the criminal proceeding.... [and] in many cases provides 'the sole occasion for public observation of the criminal justice system.' "
 
 
 91
 and
 
 
 92
 "Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. 'When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions.' Press-Enterprise I, 464 U.S. at 509, 104 S.Ct. at 823."
 
 
 93
 Id., 478 U.S. at ----, 106 S.Ct. at 2742-43, 92 L.Ed.2d at 12-13. Thus, said the Court, the complementary "considerations that led the Court to apply the First Amendment right of access to criminal trials in Richmond Newspapers and Globe and the selection of jurors in Press-Enterprise I lead us to conclude that the right of access applies to preliminary hearings as conducted in California." Id., 478 U.S. at ----, 106 S.Ct. at 2741, 92 L.Ed.2d at 11.
 
 
 94
 If there is anything that is clear from that statement, it is that neither of the "complementary considerations," taken separately or together, and nothing in the Court's analysis of them, remotely suggests their applicability to the procedural motions involved in this case. It is not only that the proceedings in Press-Enterprise II and this case are so substantially different, having distinctly different purposes, it is that the analytical basis for each of the Supreme Court's "complementary considerations" testing the constitutional right of access, are wholly inapplicable to the motions in this case to recuse Judge Aldrich and to inquire into attorney conflicts.
 
 
 95
 Nothing in the history of the criminal cases before the Norman Conquest, or the tradition of public trials in the courts of justice of England or the colonies, or the fact that Aaron Burr's probable cause hearing was held in the House of Delegates in Virginia to accommodate the crowds, and nothing in the tradition of open preliminary hearings in criminal cases in federal and state courts in this country, or in the Supreme Court's conclusion that criminal trials and preliminary hearings are sufficiently alike because both may be dispositive of the criminal charges, even remotely suggests a rationale for concluding that pretrial motions to recuse a judge and to inquire into potential attorney conflicts historically have been, or constitutionally must be, open.
 
 
 96
 The number and kind of preliminary procedural motions that can be invented and brought on for hearing by imaginative counsel specializing in the practice of criminal law today are limited only by the ingenuity of the practitioners. Experienced trial judges know that many such motions are often merely part of the preliminary ritual pretrial "fire dance" undertaken by imaginative advocates determined to psychologically condition the "environment" for maximum tactical advantage, when and if the case ever gets to trial. Such motions address a broad spectrum of purely administrative and procedural matters such as venue of the trial, continuances, advancement on the calendar, severance of parties or issues, discovery, courtroom security, substitution of counsel, and endless similar procedural matters including, in my judgment, motions for recusal of the trial judge and for inquiry into alleged attorney conflict. Such motion hearings have no bearing upon the substantive issues in the trial--the guilt or innocence of the accused--any carry with them no historic tradition of accessibility by the public; nor are they sufficiently "like the criminal trial," to implicate the first amendment interests and values that assure access to criminal trials.
 
 
 97
 Other pretrial motions may bear so directly upon the issue of guilt or innocence as to be, in essence, part of the criminal trial itself. Such proceedings might include motions and evidentiary hearings to suppress evidence, to quash an indictment or other process, to exclude evidence, and the plethora of motions and hearings brought under Federal Rule of Evidence 104(a) in which the trial court makes preliminary factual determinations that condition the admissibility of evidence at trial. Such motions and hearings may, in reality, be a part of, or so nearly like the trial itself, as to implicate the "complementary considerations" discussed in Press-Enterprise II: a "tradition of accessibility" and an important role of the public in their functioning. If so, there would be a qualified first amendment right of access. Those are not the kind of substantive issues that are involved in the pretrial motions in this case.
 
 
 98
 Understandably, the court cites no historical basis for public access to the proceedings in question here. It merely concludes that it "believe[s] the public is entitled to access" and it "know[s] of no tradition that hearings on motions to disqualify for bias are closed...." There is, of course, a distinction of considerable substance between an existence of an historical basis for a "tradition of accessibility" to motion hearings of the kind here in question, and an unawareness of a tradition to the contrary.
 
 II.
 
 99
 In my judgment, the motions to recuse Judge Aldrich and to inquire into the alleged attorney conflict of interest bear none of the indicia of any of the criteria established by the Supreme Court in Press-Enterprise II to warrant the conclusion that, like the California preliminary murder hearing in Press-Enterprise II, the public has a qualified first amendment right to be present.
 
 
 100
 Although there is a common-law tradition of access to the court's record, it is a tradition of openness that is subject to the court's control and may, in appropriate cases, be modified or suspended altogether in the court's discretion--a discretion reviewable only for abuse. Whether that discretion was abused in this case, is not before us. The district court never exercised its discretion in the matter.
 
 
 101
 I would affirm the decision of the trial court not because I agree with its resolution of the issues in this case, but because I am satisfied that there is no first amendment entitlement to access to the motion documents or to be present at the hearings on the motions. I would remand to the district court with instructions that the court make a discretionary determination whether to honor the public's presumptive common-law right of access to the motion documents that have been sealed.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Since the motion hearings, which were closed to the public, are now history, the claimed right of access to the "proceedings" must necessarily have reference to access to the verbatim transcript of the hearings
 
 
 [2]
 The Supreme Court was faced with the same situation that confronts us today. Because the preliminary hearing had been closed to the public, and a verbatim transcript made of the proceedings, the Supreme Court was required to decide whether there had been a public right of access to the hearing, and if so, enforce that right by ordering release to the public of the transcript of the hearing
 
 
 [3]
 See Press-Enterprise Co. v. Superior Court of California (Press Enterprise II), 478 U.S. ----, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); Press-Enterprise Co. v. Superior Court of California (Press Enterprise I), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)
 
 
 [4]
 See e.g. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 558, 100 S.Ct. 2814, 2818, 65 L.Ed.2d 973 (1980) (Burger, C.J., plurality opinion) ("The narrow question presented in this case is whether the right of the public and press to attend criminal trials is guaranteed under the United States Constitution."); id. at 575, 100 S.Ct. at 2826 ("In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees."); id. at 597, 100 S.Ct. at 2838 (Brennen, J., concurring) ("Popular attendance at trials, in sum, substantially furthers the particular public purposes of that critical judicial proceeding. In that sense, public access is an indispensable element of the trial process itself.") (footnote omitted). In every case where the first amendment right of "access" to judicial proceedings has been considered, the Court has determined whether the place and process are traditionally open to the public. In every instance it is a proceeding, rather than the underlying documents, to which the Court held a right of access applies. See Press-Enterprise II, 478 U.S. ----, 106 S.Ct. at 2735, 92 L.Ed.2d 1; Waller v. Georgia, 467 U.S. 39, 44, 104 S.Ct. 2210, 2214, 81 L.Ed.2d 31 (1984); Press-Enterprise I, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629; Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)
 
 
 [5]
 See United States v. Soussoudis (In re Washington Post Co.), 807 F.2d 383, 389-90 (4th Cir.1986) (affidavits filed in connection with plea and sentencing hearings); United States v. Smith, 776 F.2d 1104 (3rd Cir.1985) (bill of particulars); CBS, Inc. v. United States District Court, 765 F.2d 823 (9th Cir.1985) (documents filed in a motion for reduction of sentence); United States v. Peters, 754 F.2d 753 (7th Cir.1985) (documents admitted as evidence during pendency of trial); In re Globe Newspaper Co., 729 F.2d 47 (1st Cir.1984) (documents relating to bail proceeding); Associated Press v. United States District Court, 705 F.2d 1143 (9th Cir.1983) (pretrial criminal documents in general); United States v. Dorfman, 550 F.Supp. 877 (N.D.Ill.1982) (documents admitted into evidence during pretrial suppression hearing)
 
 
 [6]
 In Beckham, this circuit noted that,
 "The [Supreme] Court has discussed ... the media's and public's constitutional right to attend criminal trials [citations omitted] and has also discussed the common law basis for the right of access to tape-recordings admitted into evidence. [Citing Nixon ].
 "In Richmond Newspapers, the Court concluded that the right of the public and press to attend criminal trials is constitutionally guaranteed under the First and Fourteenth Amendments....
 "It is fundamental that the public and the press have 'a right to be present' and the 'rights to speak and to publish concerning what takes place at a trial.' [Citation omitted].
 * * *
 "[I]t is indisputable that the Media was never denied its constitutionally guaranteed right to be present at the trial. It was given preferential seating. Tapes that the jury heard through earphones were broadcast in open court over loud speakers. No restrictions on attendance, note-taking or publication were imposed. [The court then discusses the Nixon case.]
 * * *
 "Applying the Court's reasoning in [Nixon ].... The Constitution requires that members of the public and the media have the opportunity to attend criminal trials and to report what they have observed. [Citation omitted].... If a right to copy the tapes and transcripts in this case exists, it must come from a source other than the Constitution."
 Id. at 406-09. See also id. at 412-15.
 
 
 [7]
 This common-law right has been traced back in American jurisprudence to Ex part Drawbraugh, 2 App.D.C. 404 (1894), quoted in In re Knoxville News-Sentinel, 723 F.2d 470, 474 (6th Cir.1983); see also United States v. Mitchell, 551 F.2d 1252, 1257-60 (D.C.Cir.1976), rev'd sub nom. Nixon v. Warner Communications, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). This right has its roots in the narrower English common-law right to public records in which one has a proprietary or other legally recognized interest. See Mitchell, 551 F.2d at 1257-60; H. Cross, The People's Right to Know, 25 (1953); Project, 73 Mich.L.Rev. 971, 1179 (1975)