**In the Matter of GRAND JURY INVESTIGATION (90–3–2).**

**Misc. No. 90–0777.**

United States District Court, E.D. Michigan, S.D.

Oct. 9, 1990.

**1192**

Richard A. Rossman, Abraham Singer, Detroit, Mich., for City of Detroit.

Norman L. Lippitt, Birmingham, Mich., for Detroit Police Chief William L. Hart.

Harold Z. Gurewitz, Detroit, Mich., Peter J. Kelley, John R. Minock, Ann Arbor, Mich., for Detroit Mayor, Coleman A. Young.

Stephen J. Markman, U.S. Atty., Alan M. Gershel and Craig A. Weier, Asst. U.S. Attys., Detroit, Mich., for U.S.

## AMENDED ORDER

JULIAN ABELE COOK, Jr., Chief Judge.

This matter involves allegations of governmental misconduct that arise from the purported unauthorized disclosure of secret information and materials concerning a federal grand jury investigation in progress in this district. The petitioners [1] contend that unknown federal officials, agents, or attorneys have intentionally released confidential grand jury information to the news media in violation of Federal Rule of Criminal Procedure 6(e)(2) (Rule 6), resulting in a spate of disparaging news stories that dis-

closed the existence, purpose, and scope of the grand jury investigation.

The matter was initially brought to the attention of this Court on April 25, 1990 when counsel for the petitioners requested an informal conference in chambers to discuss a yet-to-be-filed motion that would address the alleged disclosures. During that conference, which included the Assistant United States Attorney who is in charge of the grand jury investigation, the petitioners asserted their belief in the existence of grand jury leaks, as well as an overriding desire to prevent all future unauthorized disclosures of grand jury information.

During that brief meeting, this Court indicated that it was inclined to preside and assume control over the matter because of the language of Rule 11 of the Local Rules of the United States District Court for the Eastern District of Michigan [2] and the nature of the allegations, which assail the integrity of the grand jury system in this district. The Court advised the parties that all further proceedings relating to this issue would remain confidential and under seal. Moreover, the Court indicated that it would be favorably disposed to issuing a protective order prior to, or in lieu of, addressing the merits of the City of Detroit's unfiled motion.

On April 26, 1990, the City of Detroit filed a motion for sanctions and for the issuance of a protective order, in which Chief Hart concurred. Subsequently, this Court was informed by the parties that they were in the process of drafting a proposed protective order which, if executed, might temporarily, if not permanently, alleviate their concerns. The parties eventually submitted a proposed protective order, which this Court modified in order to comply with the dictates of Rule 6 and the relevant case authority. On May 3, 1990, this Court approved, signed, and filed the modified protective order. Pursuant to agreement among counsel, the City of De-

---

1. The petitioners are (1) The City of Detroit, (2) its Mayor, Coleman A. Young, and (3) its Chief of Police, William L. Hart.

2. Local Rule 11 reads: "All grand juries are under the direct supervision of the Court. The Chief Judge shall act for the Court. The Chief

troit's motion was held in abeyance.[3] On May 17, 1990 and following the publication of additional news stories about the grand jury investigation, the City of Detroit filed a "Motion to Enforce Protective Order and Supplemental Motion for Sanctions Under [R]ule 6(e)." On the same day, the Mayor filed a "Motion for Injunctive Relief, Sanctions, and for Issuance of Protective Order Pursuant to FRCP 6(e)." Chief Hart concurred in both motions.

In their motions, the petitioners collectively request (1) an order under Rule 6 that would prohibit further disclosures of matters occurring before the grand jury to the media by any federal agent and employee who is involved in the investigation; (2) a contempt hearing and the imposition of sanctions against those persons who have violated Rule 6; (3) an order, under the supervisory powers of the Court, which would prohibit any further disclosure of information within the documents relating to the City of Detroit Police Department's Special Operations Imprest Cash Account (the so-called "Secret Service Fund") that were produced pursuant to the grand jury subpoena; (4) an order to show cause why injunctive relief should not be granted and civil contempt sanctions should not be imposed; and (5) such other relief as the Court deems appropriate.

In view of the substantive and numerous allegations within the motions, the government requested, and this Court granted,

additional time in which to respond to the motions. On May 31, 1990, the government responded to all the motions in a single pleading, a 78-page response and brief to which it appended the affidavits of government counsel and agents.[4] On June 18, 1990, the City of Detroit filed its reply brief, and on June 20, 1990, the Mayor filed his reply brief. On July 3, 1990, the government filed a motion for leave to file a supplemental reply brief in which to respond to new allegations that had been raised by the petitioners in their reply briefs.[5] Under Local Rule 17($l$)(2), this Court will not hear oral argument but will decide the matter on the parties' submissions.

### I.

A federal grand jury has been impaneled in this district purportedly to investigate (1) the Secret Service Fund, (2) the conduct of a former City of Detroit employee, Kenneth Weiner, in connection with the fund, (3) his relationship to City of Detroit officials, and (4) his involvement with Detroit Technology and Investments, Inc. (DTI), a business that is allegedly owned by the Mayor.[6] In the course of the investigation, the grand jury has apparently issued subpoenas to several high ranking officials within the City of Detroit government, including the Mayor and Chief Hart. The grand jury also issued several subpoenas

Judge, by Administrative Order, may designate Judges to act for the Court."

**3.** The Court noted that the motion would be reactivated and evaluated if the protective order should fail to stop the alleged flow of grand jury information to the media.

**4.** In order to avoid a violation of Rule 6, the government also filed a motion in which it requested permission to reveal certain grand jury matters to the Court, in camera, in an effort to properly respond to some of the petitioners' allegations. This Court granted the motion under the aegis of Fed.R.Crim.P. 6(e)(3)(C)(i), which provides that "[d]isclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—(i) when so directed by a court preliminary to or in connection with a judicial proceeding." As a result of this Order, the government submitted copies of its response brief to counsel

for the petitioners in which it redacted the material that constituted "matters occurring before the grand jury." The government then submitted to the Court, in camera and under seal, both the redacted and unredacted response briefs.

**5.** The petitioners did not object to this request. The government's motion will be granted and this Court will consider the supplemental reply brief.

**6.** Predecessor grand juries (89-2-8, 89-4-10, and 90-1-75) have purportedly conducted similar investigations. Unless explicitly stated, nothing in this opinion is meant to be, or should be construed as, a finding or findings of fact. This background information has been culled from the submissions of counsel, most of which contain disputed allegations and arguments, the resolution of which is unnecessary to the disposition of the motions.

duces tecum, which resulted in the production of numerous documents relating to the operation of the fund.

Relying upon numerous newspaper stories, television reports, and affidavits, the petitioners contend that "[t]he government, through unknown agents or employees, has engaged in a pattern and tactic of leaking information to radio, television and newspaper reporters." *See* City of Detroit's Motion for Sanctions, at 2 (4/26/90); Mayor Young's Motion for Sanctions, at 2 (5/17/90). The petitioners assert that the evidence upon which they rely establishes a prima facie violation of Rule 6.

The government raises several legal and factual defenses in response. It contends that (1) the only remedy for a Rule 6 violation is a criminal contempt action by this Court or the United States Attorney's Office—not an action for civil contempt and injunctive relief; (2) the petitioners lack standing to bring their motions; and (3) the petitioners have failed to make a prima facie showing of a Rule 6 violation. In large part, the government points an accusing finger at officials working within the governmental systems of the City of Detroit and the County of Wayne, contending that those officials have as much access to the sources of information, which was revealed in the media, as federal officials.

## II.

The Fifth Amendment to the United States Constitution provides in pertinent part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." The grand jury concept worked its way to the American colonies from England, where it originated with a public official summoning a group of townspeople to answer questions under oath. The original function of the grand jury was to give knowledge of local criminal violations to a centralized government. Through evolution, the function of protecting the accused by not indicting those whom the government wanted to prosecute was added. *See generally The Grand*

*Jury As An Investigatory Body*, 74 Harv. L.Rev. 590, 590 (1961).

As recognized under English common law, for the system to function properly, grand jury proceedings must be conducted essentially in a vacuum, free from outside influence and sufficiently enveloped so that grand jury information is not disclosed to the general public. *See Blalock v. United States*, 844 F.2d 1546, 1555 (11th Cir.1988) (Tjoflat, J., specially concurring, in which Roettger, J., joins). The United States Supreme Court has recognized that this veil of confidentiality protects the interests of the government, the public at large, and the private citizen:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Company v. Petrol Stops Northwest*, 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979). Rule 6 codifies this rule of secrecy:

> A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision *shall not disclose matters occurring before the grand jury*, except as otherwise provided in accordance with this rule. *A knowing violation of Rule 6 may be punished as a contempt of*

*court.*[7]

(emphasis added).

## III.

 The crucial issue is the extent to which a person or entity who claims a Rule 6 violation is entitled to seek any relief under the rule. The government contends that Rule 6 does not give rise to a civil cause of action for injunctive or contempt relief because it contemplates the imposition of only criminal contempt sanctions. The petitioners contend that the rule is not to be read so narrowly.[8]

The seminal opinion on grand jury leaks in the context of Rule 6 is *In re Grand Jury Investigation (Lance)*, 610 F.2d 202 (5th Cir.1980). Bert Lance, a target[9] of a grand jury investigation, filed a motion with the district court in which he requested an order that would require governmental agents and attorneys who were involved in the investigation to show cause why they should not be held in contempt for disclosing grand jury matters in violation of Rule 6. He also moved for the dismissal of the grand jury and termination of the investigation. To support his motion, Lance proffered newspaper articles that described the scope and progress of the investigation, the source of which purportedly came from persons falling within the proscriptions of Rule 6. He contended that an evidentiary hearing was necessary in order to prove his allegations.

The district court denied Lance's motion, including the request for the evidentiary hearing, because his proffer did not demonstrate a violation of the rule. On appeal, the United States Court of Appeals for the Fifth Circuit (Fifth Circuit) construed Lance's motion as seeking civil, not criminal, contempt sanctions, found appellate jurisdiction under 28 U.S.C. § 1291 and *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and reversed.

In deciding the question of appealability, the Fifth Circuit cited the well-known proposition that civil and criminal contempt proceedings are distinguished by the purpose of the proceeding and concluded that the contempt proceeding before the district court was "so clearly remedial, that [it] must be characterized as civil." *Id.* at 212.

The court articulated five factors to which a court should refer in determining if a prima facie case of a Rule 6 violation has been established and whether an evidentiary hearing should be held. Looking to those factors, the court found the news articles to contain sufficient indications of a Rule 6 violation to warrant further inquiry by the district court, possibly during an evidentiary hearing. *Id.* at 216–20.[10]

---

7. The grand jury rule of secrecy does not apply to witnesses who appear before the grand jury. Fed.R.Crim.P. 6(e)(2), Advisory Committee Notes, at 2 (1990 edition) ("The rule does not impose any obligation of secrecy on witnesses. The existing practice on this point varies among the districts."); *In re Investigation Before April 1975 Grand Jury*, 531 F.2d 600 (D.C.Cir.1976).

8. The petitioners have asserted their claims in the form of a motion, not a complaint. To the extent that they are entitled to pursue civil injunctive and contempt relief, they should proceed by way of a formal complaint. *See Barry v. United States*, 865 F.2d 1317 (D.C.Cir.1989) (proceeding under Rule 6 by way of complaint); *Blalock v. United States*, 844 F.2d 1546, 1551 (11th Cir.1988) (target must commence his injunctive action with a formal complaint). This requirement comports with basic due process concerns as well as with Federal Rule of Civil Procedure 3, which says that a civil action is commenced by filing a complaint with the court. The only exceptions to Rule 3 are a

narrowly limited class of ancillary and summary proceedings that need not be commenced by the filing of a complaint. 4 C. Wright and A. Miller, *Federal Practice and Procedure*, § 1051, at 159–60; *Minersville Coal Co., Inc. v. Anthracite Export Assoc.*, 55 F.R.D. 429, 432 (M.D.Pa. 1972). Thus, this Court must construe the motions of the petitioners as a complaint for civil injunctive and contempt relief under Rule 6.

9. A target of a grand jury investigation is a person against whom the prosecutor or grand jury has substantial evidence which ostensibly links him to the commission of a crime and who is a putative defendant. A subject of a grand jury investigation is a person whose conduct falls within the scope of the investigation. This Court has no information whether petitioners Young and Hart are or are not targets or subjects of the grand jury investigation.

10. Lance did not pursue the matter further upon remand.

Since *Lance* is a Fifth Circuit decision that was issued prior to October 1, 1981, the United States Court of Appeals for the Eleventh Circuit (Eleventh Circuit) is bound by it. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (newly created Eleventh Circuit adopts decisions of former Fifth Circuit issued prior to October 1, 1981 as binding precedent, subject to en banc reversal). Consequently, in *United States v. Eisenberg*, 711 F.2d 959 (11th Cir.1983), the Eleventh Circuit relied upon *Lance* in determining "what relief is appropriate in response to a prima facie showing that matters occurring before a grand jury were disclosed by a government[al] representative in violation of Fed.R.Crim.P. 6(e)." *Id.* at 960–61.

*Eisenberg* involved proceedings in two district courts, in each of which the *Eisenberg* appellees had filed motions that alleged Rule 6 violations. The district court in Atlanta, Georgia found that the newspaper articles upon which the appellees relied established a Rule 6 violation and issued orders that granted extensive relief. The district court in Houston, Texas issued similar orders.

On appeal, the government did not contest the Atlanta district court's finding of a prima facie case but did challenge portions of the relief that required it to furnish information to counsel for the appellees. The Eleventh Circuit initially held that the district court erred in finding a Rule 6 violation because only a prima facie case had been established, which shifted the burden to the government to negate that evidence. *Id.* at 963–64 (citing *Lance*).

The court also held that the district court's relief went too far:

Regrettably, the district court ordered the participation of counsel for the targets before conducting an *in camera* review of the government's affidavits and other information obtained by their review. Permitting targets' counsel to receive the names of all government employees involved in this investigation serves no valid purpose at this stage. While the grand jury is in session, the only interests of the targets are to stop

the prejudicial publicity and to seek the punishment of individuals guilty of Rule 6(e) violations. Counsel for the targets are entitled to have a record made of all actions by the government in response to the court's orders and of the court's *in camera* proceedings for appropriate future use.

*Id.* at 964. Another case from the Eleventh Circuit, upon which the government heavily relies, crystallizes the relevant Rule 6 issues.

In *Blalock*, a target of a federal grand jury investigation claimed in part that governmental attorneys and agents disclosed grand jury materials to unauthorized persons in violation of Rule 6. To protect his rights under the due process clause and Rule 6, Blalock moved in the district court for an order that would permanently enjoin the grand jury investigation. The district court rejected Blalock's claims and, in a per curiam opinion, the Eleventh Circuit affirmed.

A portion of the per curiam discussion of *Lance* warrants repeating:

In *Lance*, the Fifth Circuit, ignoring the question of whether a target of a grand jury investigation has the right to bring an action under the Rule to enjoin the unauthorized disclosure of grand jury matters, held that a target has the right to ask the district court to require anyone wrongfully disclosing grand jury matters to show cause why he should not be held in civil contempt and sanctioned.... In reaching this holding, the *Lance* court necessarily answered in the affirmative the question it chose to ignore—whether Rule 6(e)(2) gives a target a right of action for injunctive relief against the members of the grand jury and the prosecutors assisting them in their investigation. We make this statement because there is no such thing as an independent cause of action for civil contempt; civil contempt is a device used to coerce compliance with an in personam order of the court which has been entered in a pending case.

844 F.2d at 1550. The Eleventh Circuit then found no Rule 6 violations. By itself,

the holding of the case is insignificant. The case becomes noteworthy, however, because of the special concurrence by the two judges who constituted the quorum for the per curiam opinion.[11]

Judges Tjoflat and Roettger recognized the binding precedent of *Lance* but criticized it as unsupportable. In their view, "any reasonable interpretation of [R]ule 6(e)(2) ... forecloses the notion that the Rule provides a right of action for injunctive relief, enforceable by the district court's civil contempt power." *Id.* at 1553. Their special concurring opinion presents an exhaustive exegesis of (1) Rule 6, (2) its legislative history, (3) the traditional manner in which courts enforced the secrecy requirement, and (4) the differences between civil and criminal contempt and why civil contempt is unworkable in the context of Rule 6.

One other important decision merits discussion. In *Barry v. United States*, 865 F.2d 1317 (D.C.Cir.1989), District of Columbia Mayor Marion Barry filed a complaint for equitable relief and contempt sanctions against the Attorney General of the United States, the United States Attorney for the District of Columbia, and other federal officials, claiming that they had unlawfully disclosed matters occurring before the grand jury that was investigating allegations of governmental corruption. The government acknowledged that a cause of action could be maintained under Rule 6 but argued that Barry had failed to establish a prima facie violation of the rule.

The United States Court of Appeals for the District of Columbia Circuit Court (D.C. Circuit) agreed with the district court's characterization of Barry's complaint as a civil cause of action arising solely under Rule 6. In reaching that conclusion, it commented that "[e]very circuit that has considered the matter has recognized that a civil cause of action, either for equitable relief or civil contempt, is cognizable under Rule 6(e)(2)." [12] Its reasoning is based upon (1) the language of the rule itself, which states that a violation may be punished as a contempt of court, without restricting the contempt to civil or criminal, (2) the purpose of the proceeding, and (3) the importance of providing redress for individuals whose reputations are besmirched by grand jury disclosures.

After determining that Barry had properly asserted a civil cause of action under Rule 6, the D.C. Circuit reversed the lower court's finding that he had not established a prima facie case. The court found that one newspaper article disclosed information about matters occurring before the grand jury and indicated that the sources of the information included attorneys and agents of the government. Thus, it ordered the district court to inquire further into the allegations, "which, if proven, would justify civil contempt sanctions and/or injunctive relief under Rule 6(e)(2)." *Id.* at 1325.[13]

On remand, the government submitted affidavits from virtually every person who was connected with the investigation in which they denied disclosing grand jury matters to the news media. Barry did not offer any evidence at the hearing. Chief Judge Robinson dismissed the complaint, holding that the affidavits negated the prima facie case. *Barry*, 740 F.Supp. 888 (D.D.C.1990), *appeal filed*, (D.C.Cir.1990).

This Court disagrees with the suggestion in *Barry* that the decisions from the Fourth, Sixth, and Eighth Circuits hold that Rule 6 provides a civil cause of action for

**11.** One of the judges on the panel recused himself prior to the decision.

**12.** The court cited the following cases in support of its proposition: *Lance; Blalock; Eisenberg; In re Antitrust Grand Jury v. United States*, 805 F.2d 155 (6th Cir.1986); *Hunter v. Civella*, 673 F.2d 211 (8th Cir.1982); *In re Special April 1977 Grand Jury v. United States*, 587 F.2d 889 (7th Cir.1978); *In re Grand Jury Subpoenas, April 1978*, 581 F.2d 1103 (4th Cir.1978).

**13.** Judge Sentelle dissented based on his view that the remedy for violations of Rule 6(e)(2) is criminal, not civil, contempt sanctions. He agreed with the *Blalock* concurring opinion and disagreed with the majority's suggestion that decisions from the Fourth, Sixth, and Eighth Circuits support its result. *Id.* at 1326 & n. 1.

injunctive and contempt relief. As pointed out by Judge Sentelle in his dissent, the cases from those circuits concern grand jury irregularities but do not address whether Rule 6 provides for civil or criminal contempt actions, or both. In particular, in *In re Antitrust Grand Jury*, 805 F.2d 155 (6th Cir.1986), the district court had denied a motion to ensure grand jury secrecy as moot and for not being within the scope of Rule 6. The United States Court of Appeals for the Sixth Circuit (Sixth Circuit), referring to *Eisenberg*, indicated that there had not been any prima facie showing of a Rule 6 violation and held that the district court did not abuse its discretion in denying the motion. Clearly, the precise issue that currently confronts this Court was neither joined nor decided in that case.[14]

Moreover, in *United States v. Jeter*, 775 F.2d 670 (6th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986), the Sixth Circuit used some language which suggested that Rule 6 contemplates only criminal contempt:

> At issue here are: ... (3) a federal rule triggering the *criminal contempt power* for use as a sanction against the violation of grand jury secrets (Rule 6(e)).
>
> ....
>
> ... It is simply illogical to attempt to construe Rule 6(e)(2) as *mandating* that all other classes of individuals can act to destroy the secrecy of grand jury proceedings without *criminal sanction.* [footnote]

> [footnote] While Rule 6(e)(2) supplies "the general provision for secrecy *in order to give effect to and protect [grand jury] sealed records [citation omitted] it also prescribes and limits the exercise of the court's criminal contempt powers for all disclosure mentioned in Rule 6(e).*

*Id.* at 674–75 & n. 2 (emphasis in original in part and added in part). *But see id.* at 683 (Merritt, J., dissenting) ("Improper conduct respecting grand jury and other confidential judicial information should be punished, as it traditionally has been, by civil and criminal contempt proceedings."). The most that can be said is that the Sixth Circuit, like the Fourth and Eighth Circuits, has not squarely addressed the issue. Given the lack of controlling precedent, this Court will undertake its own analysis of the rule, its legislative history, and the relevant case authority from other jurisdictions. As will become apparent, this Court aligns itself with the *Blalock* concurring opinion and the *Barry* dissenting opinion.

### A.

Congress amended Rule 6(e) to include the contempt language in 1977. Fed.R.Crim.P. 6(e)(1), 18 U.S.C. (1976 Supp. I).[15] The pertinent language is: "A knowing violation of Rule 6 may be punished as a contempt of court." The operative words are "knowing," "may," "punished," and "contempt."

As the legislative history reveals, the contempt language was added in response to concerns raised by the amendment of the rule to allow the disclosure of grand jury matters to government employees who assist the grand jury in its investigation, such as agents of the Federal Bureau of Investigation or the Internal Revenue Service. *See* Fed.R.Crim.P. 6(e)(3)(A). Those employees also became bound by the secrecy rule. *See* Fed.R.Crim.P. 6(e)(2), (3)(B). Concern was also expressed about possible misuse of the information in later civil proceedings. In this context, a finding of Congressional intent to allow criminal contempt sanctions, as opposed to allowing a civil cause of action, necessarily follows.

**14.** Interestingly, inasmuch as the government conceded the existence of a cause of action under Rule 6 in *Barry,* the matter was not joined in the D.C. Circuit. Presumably, the issue was not fully briefed and argued given the government's concession. Similarly, *Eisenberg* was governed by *Lance,* which ignored the threshold question under the rule. *Blalock* also was governed by *Lance.*

The government in this case has specifically joined the issue of what relief is available, if any, for Rule 6 violations. This Court is writing on a fresh slate, but looks to the divergent instructions from the slates of other judges in other circuits.

**15.** The grand jury rule of secrecy was originally codified as Rule 6(e)(1), but it has been renumbered and appears today as Rule 6(e)(2).

■ The word "knowing" connotes the criminal law concept of mens rea, which refers to the level of intent that an actor must have with regard to proscribed conduct. *See, e.g., United States v. Bailey,* 444 U.S. 394, 402–06, 100 S.Ct. 624, 630–33, 62 L.Ed.2d 575 (1980); *United States v. Mongiello,* 442 F.Supp. 835, 838 (E.D.Pa. 1977) (when statute uses word "knowingly," the essential element is knowledge). Thus, the word "implies that criminal intent is a prerequisite to a finding of contempt [under Rule 6]. Criminal intent is not an element of civil contempt." *Blalock,* 844 F.2d at 1558 (Tjoflat, J., specially concurring).

■ The word "may" indicates that Congress vested the district courts with some discretion in applying contempt sanctions, for perhaps not all violations "shall" be punished. It also may have some bearing on whether the rule provides persons with a right of action under it. *See, e.g., Barry,* 865 F.2d at 1323–24 (Rule 6 not expressly limited to civil or criminal contempt).

As between civil and criminal contempt, the word "punished" pertains more to the latter concept. Criminal contempt owes its allegiance to punishment for past violations, enabling a court to vindicate its authority, as well as the public interest, by punishing contumacious conduct and violations of court orders. *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *McDonald's Corp. v. Victory Investments,* 727 F.2d 82, 86 (3rd Cir.1984). Civil contempt, on the other hand, is remedial in nature. Its purpose is to "(1) compel present or future compliance with a court order, and/or (2) compensate the contemnor's adversary for the injuries he has suffered as a result of such noncompliance." *Moore's Federal Practice,* Rules of Criminal Procedure 40–52, paragraph 42.02[2], at 42–13 (1990). An analysis of the language that was used by Congress evinces that Rule 6 is retrospective, not forward-looking.

The phrase "contempt of court" is broad, referring to neither criminal nor civil contempt and ostensibly indicating that both forms of relief are available, as suggested by the *Barry* court.

## B.

■ Legislative history radiates some informative light on the issue.[16] In Senate Report No. 95–354, 95th Cong., 1st Sess. 7, *reprinted in* 1977 U.S.Code Cong. & Admin.News 527, 530, the Senate Judiciary Committee commented that the rule "expressly provides that a knowing violation of Rule 6 may be punished as a contempt of court." Later in the Report the Committee puts the amendment in context:

The Rule as redrafted is designed to accommodate the belief on the one hand that federal prosecutors should be able, without the time-consuming requirement of prior judicial interposition, to make such disclosures of grand jury information to other government personnel as they deem necessary to facilitate the performance of their duties relating to criminal law enforcement. On the other hand, the Rule seeks to allay the concerns of those who fear that such prosecutorial power will lead to misuse of the grand

---

**16.** This section of the opinion refers to legislative history that concerns grand jury secrecy in general and Rule 6(e)(2) in particular. The Court recognizes that (1) reliance on legislative history as a means of divining Congressional intent is a dubious enterprise, one to be taken cautiously, *see Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977), (2) remarks made in the course of legislative debate or hearings by persons other than those responsible for the preparation or drafting of a bill are entitled to little weight, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203–04 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976), (3) although many portions of legislative history represent pieces in the puzzle of Congressional intent, no one piece dispositively solves the puzzle, *see Population Institute v. McPherson,* 797 F.2d 1062, 1069 (D.C.Cir. 1986), and (4) pre- and post-enactment legislative history is generally not to be accorded the same weight as that which occurs in connection with the enactment of the language which is under consideration, *see Stauffer Chemical Co. v. Environmental Protection Agency,* 647 F.2d 1075, 1079 (10th Cir.1981). Nevertheless, this Court has marshaled as much legislative history as it could locate on the problem of unauthorized grand jury disclosures and on the genesis of the Rule 6 contempt language, finding it to be helpful.

jury to enforce non-criminal federal laws by (1) providing *a clear prohibition, subject to the penalty of contempt....*

*Id.* at 531 (emphasis added). During hearings on proposed amendments to Fed.R. Crim.P. 6(e), a committee member and the Honorable Edward R. Becker, United States District Court Judge for the Eastern District of Pennsylvania, engaged in the following colloquy:

Mr. Evans, Under the present law, is there any punishment for anyone revealing the nature of a grand jury investigation prior to any final determination, and if not should there be?

Judge Becker. Congressman Evans, I know of precious few people who have ever leaked grand jury material who ever got caught. It's a very difficult thing to lay your hand on, but I believe that the court has the inherent power to proceed by way of contempt against anyone who willfully breaches the secrecy of the grand jury. I'm sure there must be some reported cases on it and I have known of proceedings where I think there have been—I think there have been some in our court—where there was a leak from the grand jury and the prosecutors in our district have been very concerned about it and very properly so.

Everybody is concerned about it and you look into it and try to find who did it; but you never do.

I do not think, however, that it's necessary that there be an express statute on it. I think the court's inherent power and its control over grand jury proceedings would be sufficient to enable it to handle that.

*Proposed Amendments to the Federal Rules of Criminal Procedure: Hearings Before the Subcommittee on Criminal Justice of the Committee on the Judiciary,* 95th Cong., 1st Sess. 44–45 (1977); *see also id.* at 55, 70 (testimony of Richard L. Thornburgh, Acting Deputy Attorney General) ("Moreover, both under this amendment and now, any improper disclosure by an attorney for the Government would constitute a serious breach of grand jury secrecy that is punishable as a contempt of court.").

Further Congressional testimony highlights the assumption that improper disclosure of grand jury matters traditionally has been addressed through the use of a court's criminal contempt powers:

Ms. Holtzman. If an IRS agent looks at grand jury materials at the request of the U.S. Attorney, is that IRS agent bound to secrecy? Is there any rule or provision that binds that agent to secrecy?

Professor LaFave. I would assume, looking back at rule 6(e), that he is bound by rule 6(e).

One of the problems is that as far as I know, there is no federal criminal statute that imposes any sanctions for this. One of the matters that our committee has discussed with respect to some other grand jury problems is the need for such a provision.

The next sentence in rule 6(e) says otherwise a juror or attorney or interpreter and so forth may disclose matters appearing the grand jury only when so directed by the court—the contempt power has been used where that rule has been violated and I would assume it could be used against the IRS agent, just as well as anybody else.

Judge Robb. I might say that the contempt route has proven quite unsatisfactory. As you will probably recall, we have had several instances recently where there have been massive leaks of testimony before the District of Columbia grand jury. Although the district court asked the Department of Justice to investigate, nothing ever came of it.

As Mr. LaFave pointed out, there is no criminal statute penalizing wrongful disclosure of matters before the grand jury. The existing rule specifically provides that no obligation of secrecy may be imposed upon any witness. So you have a problem there.

Ms. Holtzman. I am aware the Court has contempt powers to punish instances where it believes the rules have been violated.

*Id.* at 90–91; *see also id.* at 157–58 (testimony of Mr. Nussbaum).

Additional legislative history refers to the Rule 6 amendment as follows: "As modified by the other body, [R]ule 6(e) establishes a general rule of secrecy for grand jury proceedings and provides that a knowing violation of the rule of secrecy is punishable as a contempt of court." *Grand Jury Reform: Hearings Before the Subcommittee on Immigration, Citizenship, and International Law of the Committee on the Judiciary,* 95th Cong., 1st Sess. 1531 (1977). Of further interest, legislative history on grand jury reform includes a proposal to "authoriz[e] criminal sanctions to protect grand jury proceedings from improper disclosures." *Id.* at 1541.[17]

In the legislative history that relates to Rule 6 in particular and to grand jury reform in general in which reference is made to Rule 6, not one mention is made of the concept of civil contempt, much less that Congress was contemplating a civil cause of action arising from a Federal Rule of Criminal Procedure.

**C.**

Reading Rule 6 and its legislative history as contemplating criminal contempt sanctions comports with the traditional manner in which courts have addressed grand jury leaks. District courts have been prosecuting breaches of the grand jury secrecy rule for years under the common law and Rule 6 as criminal contempts. *Blalock,* 844 F.2d at 1557 (citing *In re Summerhayes,* 70 F. 769, 773–74 (N.D.Cal.1895); *Goodman v. United States,* 108 F.2d 516, 519 (9th Cir. 1939); *Schmidt v. United States,* 115 F.2d 394, 396 (6th Cir.1940); *United States v. Smyth,* 104 F.Supp. 283, 293 & n. 40 (N.D. Cal.1952); *United States v. Consolidated Laundries Corp.,* 159 F.Supp. 860, 866 & n. 9a (S.D.N.Y.1958); [*see*] L. Orfield, *The Federal Grand Jury,* 22 F.R.D. 343, 400, 448 (1959) (author, member of United States Supreme Court Advisory Committee on Rules of Criminal Procedure, notes that

---

**17.** In a legislative memorandum, the authors refer to proposals regarding the unauthorized disclosure of grand jury information:

> Section 5 would provide criminal sanctions for violations of grand jury secrecy. [footnote: This provision is in accordance with the recommendations of the Supreme Court's Advisory Committee on Criminal Rules. See Report, at 33–47.]
>
> Secrecy of grand jury proceedings is now required with limited exceptions [footnote: discussing 6(e) amendment] pursuant to a rule of the Supreme Court, Rule 6(e) of the Federal Rules of Criminal Procedure. [footnote: quoting present Rule 6(e)(2)] For its enforcement reliance is now explicitly placed on the contempt power, which has been regarded as inadequate for the purposes.

A. Nittle & M. Belsky, *Analysis of Time Periods—Present Federal Grand Jury Procedures and H.R. 94 Procedures, id.* 1579, 1581.

The Court's interest is also drawn to earlier hearings regarding grand jury reform, during which the Advisory Committee on Criminal Rules Concerning the Federal Grand Jury proposed "that a statute be enacted making the unauthorized disclosure of grand jury proceedings be a criminal offense, and that an appropriate accomodating amendment be made to Fed. R.Crim.P. 6 ..." *Hearings Before the Subcommittee on Immigration, Citizenship, and International Law of the Committee on the Judiciary,* 94th Cong., 2d Sess. 230 (1976).

The Committee Report discusses Rule 6 before the amendment that included the contempt language:

> Unauthorized disclosure of grand jury proceedings is not in itself a criminal offense, although many of the disclosures prohibited under 6(e) may be dealt with under the contempt power. See, e.g., *In re Summerhayes,* 70 Fed. 769 (N.D.Cal.1895) (grand juror held in contempt for unauthorized disclosure).
>
> It is recommended that unauthorized disclosure of matters occurring before the grand jury be made a criminal offense....
>
> ....
>
> The second consideration is that the limited reach of Rule 6(e) and the contempt power is not adequate to deal effectively with unauthorized disclosure. For one thing, disclosures which are in violation of rule 6(e) may be reached under the contempt power only if the circumstances meet the requirements of 18 U.S.C. § 401....
>
> Under the predecessor to this statute, it has been held that the oath of secrecy taken by a grand juror is a lawful command, so that unauthorized disclosure by that juror may be punished as criminal contempt....
>
> ....
>
> Illustrative of the type of statute which would be appropriate is the following:
>
> (a) Whoever knowingly discloses any evidence introduced or statement made before any grand jury ... shall be fined ... or imprisoned....

*Id.* at 241–43.

criminal contempt is accepted sanction for violations of Rule 6)); *see also United States v. Cardall*, 773 F.2d 1128, 1134 (10th Cir.1985) (citing cases); *United States v. Dunham Concrete Products, Inc.*, 475 F.2d 1241, 1249 (5th Cir.) (contempt citation adequate to halt any impropriety), *cert. denied*, 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1973); *United States v. Hoffa*, 349 F.2d 20, 43 (6th Cir.1965) (unauthorized disclosures punishable as contempt), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. United States District Court*, 238 F.2d 713, 721 (4th Cir.1956) (improper grand jury disclosure subjects person to attachment for contempt), *cert. denied sub nom. Valley Bell Dairy Co., Inc. v. United States*, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957); *United States v. Schiavo*, 375 F.Supp. 475, 478 (E.D.Pa.) (remedy for grand jury disclosure is to punish offending party in contempt proceeding), *aff'd*, 506 F.2d 1053 (3rd Cir.1974); *In re Petroleum Industry Investigations*, 152 F.Supp. 646, 647 (E.D.Va. 1957).

This Court agrees with Judge Sentelle that "[n]othing in the 1977 amendment adding the contempt provision indicated any intent to do other than codify the pre-existing practice." *Barry*, 865 F.2d at 1328 (Sentelle, J., dissenting).

### D.

■ Although this Court recognizes that civil and criminal contempt proceedings are distinguished primarily by (1) the relief sought, (2) the purpose of the proceeding, and (3) the actual relief imposed, before answering whether a Rule 6 contempt proceeding is criminal or civil in nature, or both, another question must be answered: whether Rule 6 allows anyone to bring a civil cause of action under the rule. *Blalock*, 844 F.2d at 1550. It matters little that the petitioners seek primarily, though not exclusively, remedial or coercive relief if the rule offers them no entitlement to such relief. Rule 6, its legislative history, and traditional court practices lead to the ineluctable conclusion that the rule

authorizes criminal contempt sanctions, not a civil cause of action. Furthermore, an uneasiness results from allowing a civil cause of action to spring from a Federal Rule of Criminal Procedure.

■ The Supreme Court has seen an increase in the number of cases in which a party raises the question as to Congress' intent "to create a private right of action under a federal statute without saying so explicitly." *Middlesex County Sewerage Authority v. National Sea Clammers Assoc.*, 453 U.S. 1, 13 n. 21, 101 S.Ct. 2615, 2622 n. 21, 69 L.Ed.2d 435 (1981). The answer to such a question requires a review of the statutory language, the legislative history, and other traditional aids of statutory interpretation in order to determine Congressional intent. *Id.* at 13, 101 S.Ct. at 2622–23; *see supra* Sections III(A), (B), & (C).

The Supreme Court has adhered to a stricter standard for the implication of private causes of action of late, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979), as well as admonished that "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Id.* at 568, 99 S.Ct. at 2485 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1952–53, 60 L.Ed.2d 560 (1979)); *see also Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979).

The teaching of these cases[18] cautions against implying a civil cause of action for injunctive and contempt relief under Rule 6(e)(2) of the Federal Rules of Criminal Procedure. The retrospective language of the rule expressly provides for a judicially-enforced remedy, contempt, which the pertinent indicators instruct is criminal in nature. Thus, this Court "must be chary of reading [other remedies] into [the rule]." *Transamerica*, 444 U.S. at 19, 100 S.Ct. at 247.

---

**18.** Neither the parties nor the cited cases in which Rule 6 is analyzed discuss this line of authorities. However, this Court finds it highly instructive if not controlling.

By its terms, the rule grants no private rights to any identifiable class of persons.[19] Moreover, there is a paucity of evidence in favor of implying a civil cause of action. The only argument in favor of doing so is the nonexclusivity of the contempt language. However, "implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best." *Touche Ross*, 442 U.S. at 571, 99 S.Ct. at 2486. Congress knows how to provide for civil contempt sanctions. *See, e.g.*, 28 U.S.C. § 1826 (providing for civil contempt remedies for recalcitrant witnesses).

### E.

 This Court also questions the need for, as well as the workability of, civil contempt and injunctive relief to vindicate the rule of grand jury secrecy. Although Rule 6 is not an adjudicative order by itself, *see Blalock*, 844 F.2d at 1555 n. 10, there is no reason why its proscriptions cannot and should not be enforced by the Court or the United States Attorney's Office without resort to civil suits.[20]

 The existence of Rule 6 makes redundant any injunctive order which parrots it.[21] In theory, the entry of an injunctive order may provide for further coercive action and vindicate Rule 6 concerns, but not in practice. Judge Tjoflat, for example, poses an interesting hypothetical:

> Posit a case in which the prosecutor leaks to the press grand jury information concerning the target. Pursuant to the rule established in *Lance*, the target moves the court to order the prosecutor

to show cause why he should not be held in civil contempt and sanctioned. The court issues the order, and at the show cause hearing, the prosecutor admits responsibility for the disclosure. Suppose further that the court does not sanction the prosecutor, but rather warns him that it will tolerate no further disclosure—as the district court did in *Lance*. The prosecutor, however, continues to leak additional grand jury matters to the press. On the target's application, the court holds another show cause hearing, finds that the prosecutor violated the Rule, and concludes that the issuance of a civil contempt sanction is now necessary to ensure future compliance with the Rule. Believing that a fine will not ensure compliance, the court chooses to incarcerate the prosecutor, and the United States Marshal takes him into custody. To avoid transforming the incarceration into punishment for past misconduct—the sanction for criminal contempt—the court advises the prosecutor that his incarceration will be terminated just as soon as he obeys the law. In other words, the court gives the prosecutor the "key to his prison"; he can purge himself of the contempt and obtain his release from custody by not making further disclosures of grand jury matters.

To purge himself and obtain his release from custody, the prosecutor must (1) satisfy the court that matters concerning the target remain before the grand jury that have not been disclosed previously, or, if everything has been

---

**19.** The petitioners do not address in whose favor the purported civil cause of action accrues (targets, subjects, or any member of the public at large, including public entities such as the City of Detroit).

**20.** When civil coercive and criminal punitive purposes are present in a contempt proceeding, the matter should be treated as criminal, at least for appellate purposes. *Thyssen, Inc. v. S/S Chuen On*, 693 F.2d 1171, 1175 n. 4 (5th Cir. 1982).

**21.** Section 401 of Title 18 has been used as the basis upon which to sanction a person who violates the rule. Courts have employed 18

U.S.C. § 401 for both civil and criminal contempt purposes. *United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998 (8th Cir.1970). *Barco* also holds that section 401 is not unconstitutionally vague because it does not distinguish between civil and criminal contempt.

Similarly, this Court could employ civil and criminal contempt sanctions as necessary under that section, Rule 6, and its supervisory powers, to effectuate the purposes behind the grand jury rule of secrecy. This proposition is not inconsistent with the approach that this Court is taking toward the petitioners' motions, in that this Court is distinguishing between (1) what a *person* is entitled to under the rule and (2) what a *court* is entitled to do under the rule.

disclosed, that further matters concerning the target will be presented to the grand jury [footnote omitted]; and (2) convince the court, albeit with a self-serving promise, that he will not disclose these matters in violation of the Rule. In short, the prosecutor must promise to obey the law, and he must do so in a way that convinces the court that he will abide by his promise. The prosecutor can give the court no further assurances.

The prosecutor promptly makes such a promise, but the court is not convinced; consequently, he will remain in custody indefinitely, until the court changes its mind. In this scenario, the court's decision to keep the prosecutor in custody is based on the prosecutor's past misconduct in leaking the grand jury information to the press; in other words, the prosecutor's previous disregard of the Rule's prohibition renders his promise worthless in the eyes of the court. The court's decision has therefor transformed the case from a proceeding for civil contempt into one for criminal contempt....

The foregoing hypothetical demonstrates the futility of a civil contempt sanction as a means of ensuring grand jury secrecy. The only purpose a show cause hearing can serve ... is to give the court a forum in which to ask the contemnor to obey the law.

*Blalock,* 844 F.2d at 1559–60; *see also Barry,* 865 F.2d at 1328 (Sentelle, J., dissenting) ("It is difficult to see how such [civil] coercion could ever be efficacious.").

A further example can be posited which addresses some of the petitioners' arguments in response to Judge Tjoflat's hypothetical. Suppose that this Court, by an investigation or pursuant to an admission, finds that a federal official has violated Rule 6. Under the approach which has been proposed by the petitioners, this Court could, under its Rule 6 civil contempt powers, issue a broad injunctive order, among other forms of relief. The petition-

ers also contend that to coerce compliance with the rule and remedy the violations, a range of sanctions escalating in severity is available, including, *inter alia,*

a. Imposing fines for each act of future noncompliance. *See, West Texas Utilities Company,* [*Inc. v. NLRB,* 206 F.2d 442] at 488 (D.C.Cir.)[, *cert. denied,* 346 U.S. 855, 74 S.Ct. 70, 98 L.Ed. 369 (1953).]

b. Requiring the Government to pay costs and attorney fees incurred in coercing compliance. *West Texas Utilities Company, supra,* at 448.

c. Ordering the Government to conduct an internal investigation to determine the sources of the disclosures. *United States v. Kearney,* 436 F.Supp. 1108, 1119 (S.D.N.Y.1977)....

d. Removing the offending parties from continuing their involvement with the investigation or the grand jury proceedings. *See, Lance v. Plummer,* 353 F.2d 585 (5th Cir.1965)[, *cert. denied,* 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1966).]

e. Quashing grand jury subpoenas. *See, United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972); *Matter of Aichuleta* [sic], 432 F.Supp. 583, 593 (S.D.N.Y.1977).

Finally, if the imposition of one or more of these sanctions fail to coerce compliance, this court has the authority to simply dissolve and dismiss the grand jury. *See, Lance, supra,* at 219; *Hunter v. Sivella,* 673 F.2d 211 (8th Cir.1982).

City of Detroit's Reply Brief, at 19–20. These arguments are unpersuasive as reasons for permitting a civil cause of action under the rule.

The petitioners' first suggested coercive sanction—civil fines—is no different from the authority of the court under its criminal contempt powers. It is also nothing more than a criminal contempt sanction under the guise of civil contempt.[22] Moreover, the petitioners assume

---

**22.** In a civil contempt proceeding, the court may impose a fine payable to the aggrieved party as compensation for any damages that

were sustained as a result of the contemnor's conduct, but the fine must be based on evidence of actual loss. *Thyssen,* 693 F.2d at 1173. The

that each time a news story is published in which grand jury matters appear to be revealed, a monetary sanction is to be imposed against either the government qua government or the individual against whom the injunctive order was entered. This result cannot obtain. Contempt liability is individual, and each purported Rule 6 violation must be addressed individually. This Court cannot assume that (1) each apparent Rule 6 violation is indeed a Rule 6 violation and (2) the same person who violated the rule in the past violated it again. Rather, the Court would need a legal basis upon which to decide that a particular person violated the rule.[23] Furthermore, the Rule 6 situation is unlike the typical civil contempt case in which a party, carrying the keys to the jail cell, can purge his contempt by an affirmative act. *See United States v. Powers,* 629 F.2d 619, 627 (9th Cir.1980).

 The same problems apply to the petitioners' second proposed coercive sanction. In addition, there is a matter that also has a bearing on Congressional intent in amending Rule 6: immunity. The petitioners suggest that this Court can order the United States government to pay a fine for each "future act of noncompliance" and "costs and attorney fees incurred in coercing compliance." City of Detroit's Reply Brief, at 19–20. However, the United States and its agencies are immune from suit unless that immunity is waived. *See Block v. North Dakota,* 461 U.S. 273, 280–82, 103 S.Ct. 1811, 1816–17, 75 L.Ed.2d 840 (1983); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586–87, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941); *Massachusetts v. United States Veterans Administration,* 541 F.2d 119, 123 (1st Cir.1976). And immunity

cannot be avoided by naming officers and employees of the United States as defendants. *Ecclesiastical Order v. Chasin,* 845 F.2d 113, 115–16 (6th Cir.1988); *Sprecher v. Graber,* 716 F.2d 968, 973–75 (2d Cir.1983) (immunity extends to U.S., agencies, and agency officials acting in official capacities); *Burgos v. Milton,* 709 F.2d 1, 2–3 (1st Cir.1983) (soverign immunity may, in proper case, bar suit against federal official in his official capacity).[24]

The cases upon which the petitioners rely do not hold that (1) the Court may impose monetary sanctions, costs, and attorney fees against the United States government to coerce individual compliance with Rule 6 and (2) the United States has waived its immunity from monetary sanctions for violations of Rule 6. *See also Middlesex County,* 453 U.S. at 9 & n. 14, 101 S.Ct. at 2621 & n. 14.

 The doctrine of sovereign immunity, which makes important distinctions between the United States, its agencies, and its officers in their individual and official capacities, also highlights the problem with allowing allegations of Rule 6 violations to be brought in the form of a motion. Finally, in any event, the Court could impose similar sanctions on the individual who has been found guilty of violating Rule 6 under the criminal contempt powers of the Court.

 The third proposal is of no moment because this Court has the power to conduct an external investigation, order an internal investigation, or appoint a special master/prosecutor to pursue the matter. *See Eisenberg,* 711 F.2d at 960; *Matter of Archuleta,* 432 F.Supp. 583, 599 (S.D.N.Y. 1977). Under a criminal or civil contempt proceeding, the court must have some basis

petitioners do not articulate to whom the requested fines should be paid.

**23.** That person also may seek a jury trial to challenge the contempt charge. *See United States v. Smith,* 815 F.2d 24 (6th Cir.1987) (conviction under 18 U.S.C. § 401 for violating Rule 6 by unlawfully disclosing investigative reports (containing grand jury matters) to a newspaper reporter).

**24.** However, the doctrine of sovereign immunity does not bar an action for damages against a

federal official who has been sued in his individual capacity for violations of constitutional rights. *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Kozera v. Spirito,* 723 F.2d 1003, 1007–08 (1st Cir.1983) (exceptions to immunity limit its scope in injunctive suits against federal officials).

upon which to find someone in *knowing* violation of the rule. Some form of an investigation will typically be necessary prior to charging someone with criminal contempt.

■ The fourth proposal does not differ significantly from the relief available under criminal contempt. First, to the extent that a court sentences a Rule 6 violator with imprisonment, he of necessity cannot participate in the investigation or grand jury proceedings. Second, the Court believes that it has the authority to impose similar relief under its inherent and supervisory powers, if not under the rule itself. Third, this Court would be astonished if a federal official who has been held in criminal contempt for violating such an important rule would be allowed to remain in the employ of the agencies whose responsibilities are to enforce the laws.

For the reasons that have already been articulated, the last two propositions do not materially advance the petitioners' claim of the workability of civil contempt and injunctive relief. Moreover, the decisions in *Lance* and *Barry* do not offer district court's any guidance on the management of the "evidentiary hearing." For example, the prima facie case typically will demonstrate that someone is violating Rule 6 but will not demonstrate the identity of that person. Accordingly, a seemingly infinite number of witnesses could be subpoenaed to testify at the required hearing, including agents, attorneys, and members of the news media.[25] The government may be required to call witnesses to demonstrate that persons who are not subject to Rule 6 have or could have disclosed the information to the media. In *Barry*, there were over one hundred persons subject to being called at the hearing. The appellate opinions do not indicate who is entitled to

participate at the hearing, whether the hearing is open to the public, whether there is any limit to the scope of the hearing, and whether the direct and cross-examination could reveal "matters occurring before the grand jury." The evidentiary hearing in the end may subvert the interests Rule 6 is designed to protect.

In addition, since criminal contempt remains a viable option to the district court for Rule 6 violations, presumably the witnesses/contemnors would be entitled to assert their rights to counsel, to proof beyond a reasonable doubt, to the presumption of innocence, to the privilege against self-incrimination, and to a jury trial. *See In re Jaques*, 761 F.2d 302, 309 (6th Cir.1985) (Hilman, D.J., dissenting), *cert. denied*, 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986); *Thyssen*, 693 F.2d at 1175 n. 4.

■ To be sure, if this Court finds a pattern of grand jury disclosures by one or more federal officials, it could impose some of the sanctions to which the petitioners refer. However, it is the affirmative duty of this Court, or the United States Attorney's Office, to enforce the rule of grand jury secrecy—not any enforceable right that adheres to the petitioners.[26]

### IV.

For the foregoing reasons, this Court will dismiss the petitioners' motion and purported civil cause of action on grounds of standing and their failure to state a claim upon which relief can be granted. *See Blalock*, 844 F.2d at 1561; *Barry*, 865 F.2d at 1328. This ruling extends only insofar as the petitioners claim an entitlement to assert individual and enforceable rights of injunctive and civil contempt relief under Rule 6(e)(2) of the Federal Rules of Criminal Procedure.

---

**25.** Depending upon state law, the reporters may be able to claim a reporter's privilege.

**26.** Although the petitioners have a "right" to bring allegations of Rule 6 violations to the attention of this Court and the United States Attorneys Office, they have no "right" of action because they are "simply ... member[s] of the public who ha[ve] complained to the prosecutorial authority that a crime may have occurred."

*Blalock*, 844 F.2d at 1561. To the extent that the petitioners believe that this Court fails in its duty to investigate Rule 6 allegations, a writ of mandamus may lie. *See Lance*, 610 F.2d at 227 (Kravitch, J., dissenting) (citing *In re Grand Jury Subpoenas*, 581 F.2d 1103 (3rd Cir.1978), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979)).

To the extent that the petitioners seek relief under the supervisory powers of this Court, their request will be denied to the degree to which they request. This Court must exercise its supervisory powers sparingly, and a defendant is entitled to invoke them by showing (1) a long-standing problem of prosecutorial misconduct and (2) prejudice. *See, e.g., United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir.1985). The petitioners have failed to meet this standard. This Court may invoke such powers after further investigation, but such action is a matter on which the petitioners have no say.

## V.

The petitioners have brought a panoply of news articles, which purport to establish violations of the rule of grand jury secrecy, to the attention of this Court as they are entitled to do. *See Blalock*, 844 F.2d at 1561. Therefore, a duty arises for this Court to review the charges and determine whether an investigation should be conducted to find out (1) if a violation occurred, (2) who violated the rule, and (3) whether criminal contempt proceedings should be instituted.[27] Inasmuch as this Court has declined to follow *Lance*, it is not bound by any of the prima facie standards which were articulated in that decision. However, these standards are clearly well-placed guideposts of which this Court will take notice.

A prima facie violation of Rule 6 that is based upon news reports of grand jury inquiries is established when (1) the reports contain information about "matters occurring before the grand jury" and (2) the information came from a person on whom Rule 6(e) imposes the obligation of secrecy. F.R.Crim.P. 6(e)(2); *Eisenberg*, 711 F.2d at 963; *Lance*, 610 F.2d at 214.

The prohibition against the disclosure of matters occurring before the grand jury is not a prohibition against the disclosure of all information that is presented to a grand jury. "The aim of the rule is to prevent disclosure of the way in which information was presented to the grand jury, the specific questions and inquiries of the grand jury, the deliberations and vote of the grand jury, the targets upon which the grand jury's suspicion focuses, and specific details of what took place before the grand jury." *In re Grand Jury Investigation of Ven–Fuel*, 441 F.Supp. 1299, 1302–03 (M.D.Fla.1977).

### A.

Examples of "matters occurring before the grand jury" are (1) transcripts of the testimony of witnesses and statements made before the grand jury; (2) internal governmental memoranda that reflect what transpired before the grand jury. *In re Grand Jury Proceedings*, 613 F.2d 501, 505–06 (5th Cir.1980); *United States Industries, Inc. v. United States District Court*, 345 F.2d 18, 20–21 (9th Cir.), *cert. denied*, 382 U.S. 814, 86 S.Ct. 32, 15 L.Ed.2d 62 (1965); (3) witness interviews and auditor's analyses that have been prepared for grand jury use. *In re Grand Jury Matter (Garden Court Nursing Home, Inc.)*, 697 F.2d 511, 512–13 (3d Cir. 1982); and (4) information which reveals the identities of witnesses or jurors, the substance of the testimony or evidence, and the deliberations or questions of the grand jury. *In the Matter of Electronic Surveillance*, 596 F.Supp. 991, 995–96 (E.D.Mich. 1984).

In addition, courts have interpreted the secrecy requirement to apply not only to information that has been drawn from transcripts of grand jury proceedings, but also to anything that may tend to reveal what transpired before the grand jury. *United States v. Armco Steel Corp.*, 458 F.Supp. 784, 790 (W.D.Mo.1978); *see Anaya v. United States*, 815 F.2d 1373, 1380 (10th Cir.1987) (memorandum of testimony given to grand jury is secret; memorandum of testimony given to investigators outside grand jury room not secret); *United States v. Gold*, 470 F.Supp. 1336, 1350 (N.D.Ill.

---

**27.** When the Court conducts the necessary investigations or hearings, the problems that relate to the extent to which counsel for targets or subjects should be able to participate are alleviated. *See Blalock*, 844 F.2d at 1560–61 n. 21; *Eisenberg*, 711 F.2d at 964–66.

1979). The *Lance* court, 610 F.2d at 217, construed Rule 6 to apply not only to events that have occurred before the grand jury, but also to events that will occur, such as statements which (1) identify persons who have been subpoenaed to testify or (2) designate the date on which an indictment will be returned. *See also Senate of the Commonwealth of Puerto Rico v. United States Department of Justice*, 823 F.2d 574, 582 (D.C.Cir.1987); Annot., 50 A.L.R.Fed. 675 (1980).

In *In re Grand Jury Proceedings*, 851 F.2d 860 (6th Cir.1988), the Sixth Circuit indicated that, in deciding what is or is not a "matter occurring before the grand jury," the overriding guide is the purpose of the rule—to preserve inviolate the secrecy of the proceedings. Thus, although courts commonly analyze whether "a given matter was intended to reveal or would reveal what transpired in the grand jury inquiry, the purposes of grand jury secrecy ... extend further." In the narrow matter at issue in that case, the court held that confidential documentary information not otherwise public that was obtained by the grand jury by coercive means is presumed to be "matters occurring before the grand jury." *Id.* at 866.

█ As a general proposition, however, physical evidence, such as a document, does not become secret merely because it has been presented to a grand jury, if it was created for purposes other than the grand jury investigation and its disclosure does not reveal matters occurring before the grand jury. *See United States v. Phillips*, 843 F.2d 438, 441 (11th Cir.1988) (financial documents obtained by grand jury subpoena but never submitted to grand jury not matters occurring before grand jury and not subject to secrecy); *In re Grand Jury (Catania)*, 682 F.2d 61, 64 (3d

Cir.1982) (materials obtained by FBI during investigation without grand jury participation not matters occurring before grand jury).

## B.

The *Lance* court provided some factors that a court may consider in deciding whether the news stories indicate the source of the information is a person who is subject to the Rule 6 proscriptions:

> It is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection. [footnote omitted].

> The inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made. At the same time, even with such a response, the detail as well as the seriousness of a disclosure may militate in favor of a further investigation of its source in the form of an evidentiary hearing.

> While each article must be parsed individually, the testing for a prima facie case must also include a review which considers the whole spectrum of news articles. The precise attribution of a source in one or more articles may give definition to a vague source reference in others because of their content in time or context.

610 F.2d at 218–19.

## VI.

█ The petitioners refer this Court to a host of newspaper and television reports, some of which clearly do not implicate Rule 6,[28] some of which marginally might,[29] and

---

**28.** For example, the following articles do not demonstrate violations of Rule 6 because (1) they do not reveal matters that occurred before the grand jury or (2) to the extent that they might, they do not identify a person who is subject to Rule 6 as the probable source for the information.

Ashenfelter, Finkelstein & Swickard, *FBI reportedly probes misuse of police drug fund*, Detroit Free Press, November 17, 1989, at 3A (article reports that FBI investigating Detroit police officials for their handling of narcotics enforcement accounts and for possible diversion of funds through phony corporations; not a report of a matter occurring before the grand jury but a report of investigative details, not prohibited by Rule 6).

*City cops are target of inquiry*, Detroit News, November 17, 1989, at 1A (same).

**29.** See note 29 on page 1209.

some of which do. Only those articles that

Farrell, *FBI asks Hart about police fund*, Detroit News, November 18, 1989, at 1A (article discusses meeting between Hart and government, which is not a matter occurring before the grand jury).

Ashenfelter & Finkelstein, *Police fund probe targets West Coast firm*, Detroit Free Press, November 23, 1989, at 4A (article reports that West Coast firm received payments totaling hundreds of thousands of dollars from a Detroit police fund according to government officials familiar with the federal probe of police fund; article does not report on matters occurring before the grand jury but contains investigative details).

Finkelstein, *Hart's name on check to suspect firm*, Detroit Free Press, December 1, 1989, at 1A (article discusses, among other items, Chief Hart's signature on a check made out to a West Coast firm and Weiner's involvement in allegedly diverting money from secret service fund; matters occurring before grand jury not revealed in article and there are many possible sources for the information revealed in the article).

Musial, *Secret fund misuse possible, Hart says*, The Detroit News and Detroit Free Press, December 2, 1989, at 3A (interview with Chief Hart; not a matter occurring before the grand jury and no federal sources identified).

*Police Probe: The unturned rocks keep getting bigger*, Detroit Free Press, January 3, 1990, at 6A (article discusses disappearance of certain records and Weiner's possession of keys to unmarked police car; Rule 6 not implicated because the article merely reports investigative details).

Wark & Farrell, *Young heads consulting firm*, Detroit News, January 14, 1990, at 1A (article reports that Mayor Young heads a private consulting business; Rule 6 is not implicated because the article does not discuss grand jury matters and it identifies state documents and telephone company records as sources for the information reported).

McGraw & Dozier, *Office ties Weiner to Young's firm*, Detroit Free Press, January 15, 1990, at 1A (article reports that Weiner and Mayor Young had business connections; no grand jury matters revealed and no Rule 6 person identified).

Toy, Farrell & Wark, *Weiner bought $1 million in gold*, The Detroit News and Free Press, January 21, 1990, at 1A (article reports on Weiner transactions, but cites sources as other people involved in the transactions as well as testimony in open court and investigative details).

Cannon & Wark, *Young's firm tried to buy luxury condo*, Detroit News, March 2, 1990, at 1A (article reports that Mayor Young tried to buy a luxury condominium, "people involved in the deal said"; article does not report on grand jury matters and it identifies private citizens as the source of the information).

Farrell & Wark, *Young's firm sold gold coins*, Detroit News, April 5, 1990, at 1A (article reports on Mayor's firm's sale of gold coins; no Rule 6 violation indicated because the sources

evince Rule 6 violations, or that have not of information cited are documents obtained by the reporters and the gold dealer, and there is no revelation of matters occurring before the grand jury; the article reports what the reporters have been able to uncover through their own investigative efforts, not what federal officials have disclosed to them).

Toy & Twardon, *Young's Krugerrand deals outrage crtitics [sic], stun allies*, Detroit News, March 6, 1990, at 1A (article makes no mention of grand jury and cites no federal source).

Swickard, Zablit & Finkelstein, *Young profited on gold sales without knowing S. Africa link*, Detroit Free Press, March 6, 1990, at 1A (article reports that Mayor Young profited on sale of gold coins engineered by Weiner, but does not report on matters occurring before grand jury or identify any federal sources).

McGraw, Prater, Zablit & Finkelstein, *Weiner called FBI informant*, Detroit Free Press, March 8, 1990, at 1A (article discusses what Weiner revealed to public in open court in separate fraud case, not a Rule 6 violation).

Vance, Lengel & Wark, *Con man? Informant? Both?*, Detroit News, March 8, 1990, at 1A (same).

Swickard & Finkelstein, *Weiner's request for release is denied*, Detroit Free Press, March 17, 1990, at 3A (article reports on separate case involving Weiner, but no grand jury information revealed).

McGraw, *Angry Mayor says FBI leaks rumors*, Detroit Free Press, March 9, 1990, at 1A (same, no Rule 6 information revealed).

Zablit, *Fund bought TV dish for the mayor*, Detroit Free Press, April 11, 1990, at 1A (article reports that Secret Service fund was used to help pay for a satellite dish and TV hookup at Mayor's residence, according to records reviewed by the Free Press; article does not reveal matters occurring before the grand jury and mentions only records and "people familiar with ongoing investigations," which is too vague a reference to attribute to a federal source).

Cannon, *Hart's $13,000 cash deal probed*, Detroit News, April 17, 1990, at 1A (article reports that federal agents questioned a Detroit automobile dealer about more than $13,000 that Chief Hart paid in cash toward a car; article does not reveal a matter occurring before the grand jury and it mentions a nonfederal source for the information, the car dealer).

Zablit, *Prosecutors reportedly making deal with Weiner*, Detroit Free Press, May 10, 1990, at B1 (article reports that Weiner and government negotiating a plea in separate fraud case; no Rule 6 information revealed).

Cannon & Ingersoll, *Young–Weiner tie raises questions*, Detroit News, May 14, 1990, at 1A (no Rule 6 information revealed).

**29.** The following two articles arguably implicate Rule 6, but the government has sufficiently negated any inference that these articles reveal a Rule 6 violation by anyone in the government.

been sufficiently rebutted by the government,[30] will be addressed.

The first article of concern appeared on November 18, 1989, in which the following information was revealed:

> Two City of Detroit auditors have been subpoened by a federal grand jury investigating possible theft from two controversial police narcotics and undercover accounts, Detroit Auditor General Roger Short said Friday.
>
> . . . .
>
> But <u>an official familiar with the probe said</u> the FBI served subpoenas on four auditors Thursday and Friday. <u>The official, who spoke on condition of anonymity, said the auditors were ordered to appear before the grand jury early next month.</u>
>
> . . . .
>
> <u>About a dozen police executives have also been summoned to testify before the grand jury, the official said.</u>[31]

Ashenfelter & Finkelstein, *City Auditors Subpoened in police drug fund probe*, Detroit Free Press, Nov. 18, 1989, at 1A.

In a Detroit Free Press article on January 17, 1990, a reporter revealed that "[m]ore than $1 million in checks written to cash were drawn from the Detroit Police secret service fund from 1985 to 1988, people familiar with the federal probe of the fund said Tuesday." The article then says:

> Wark & Farrell, *75 called to testify in probe of police*, Detroit News, January 5, 1990, at 3A (although Rule 6 seemingly implicated, the reporters confuse the Weiner fraud case with the Secret Service fund investigation in which Weiner is reportedly involved; much of the information in the article is demonstrably false).
>
> Cannon, *Young's firm paid Weiner $105,000 after gold sales*, The Detroit News and Free Press, May 13, 1990, at 1A (article reports that Mayor Young's firm paid $105,000 to Weiner following a sale of gold coins and displays copies of two checks; although the petitioners contend that this article demonstrates a Rule 6 violation in large part because the original checks, in the control of the federal government pursuant to subpoena, were purportedly shown to the reporter, the government's affidavits sufficiently negate that claim; in addition, the article does not reveal matters occurring before the grand jury).

> *Several people who testified recently before the federal grand jury probing alleged misuse of the fund were shown the cash checks, and said Hart's signature appeared on many of them, according to an official who spoke on condition he not be named.*
>
> *The jury is probing whether hundreds of thousands of dollars were diverted from the fund. . . .*

Finkelstein, *Secret Fund paid over $1 million to "cash,"* Detroit Free Press, January 17, 1990, at 1A.

Switching to the Detroit News, the Court notes the article emblazoned with the headline "Hart delivers police fund financial data to U.S. grand jury," and which reported that Chief Hart

> [a]ccording to law enforcement officials, [ ] *gave the [grand] jury financial documents relating to the secret fund. . . .*
>
> . . . .
>
> Hart avoided reporters and had no comment *on his hour before the grand jury.*
>
> U.S. Attorney Stephen J. Markman declined to comment on the chief's appearance, but said grand juries often ask possible targets to provide documents.

Lengel, *id.*, Detroit News, February 14, 1990, at 1A.

In their combined Sunday Edition, The Detroit News and Free Press also reported that

> **30.** Although the government has submitted affidavits in which federal agents and attorneys deny violating Rule 6, the Court is not satisfied that all those persons to whom the rule applies have submitted affidavits, as in the *Barry* case on remand. The government persuasively maintains that the earliest article that has been cited by the petitioners was published on November 17, 1989, the day after the FBI completed its initial interviews with City of Detroit police officials, which suggests that local sources are responsible for the news stories. However, because of the seriousness with which Rule 6 should be viewed and the continuing publicity, this Court cannot conclude the matter on the basis of a paper record.

> **31.** The language indicating possible Rule 6 violations is underlined.

[a] federal grand jury investigating the police department's secret service fund *issued subpoenas for the [police] aircraft's records.* Ten department pilots were ordered to submit personal flight logs dating from January 1987 for police department aircraft. The *grand jury also reportedly is looking at maintenance records and purchase vouchers for the jet.*

Wark & Farrell, *City's jet made holiday trips to vacation spots,* The Detroit News and Free Press, May 6, 1990, at 1A.

In a quizzical editorial, the Detroit Free Press, commenting on the allegations surrounding the Mayor and Kenneth Weiner, opined: "At the same time, the federal agencies have an obligation to focus on deciding who has broken the law and following those trails where they lead, *rather than simply leaking embarrassing material.*" In Our Opinion, *Bank Records: Young must address financial dealings with Weiner,* Detroit Free Press, May 15, 1990, at 6A.

Following the parties' submissions in this matter, and while this Court was in the process of addressing the motions, another article was published that raised the prospect of a Rule 6 violation. The article, entitled "Police probe looks at writing: Grand jury collects samples to check for signs of forgery," reports that,

> [t]he possibility that Detroit Police Department secret service fund checks were forged has come under scrutiny by the federal grand jury investigating whether money was pilfered from the fund, according to people familiar with the federal probe.
>
> According to the people, who spoke this week on condition of anonymity because the investigation is ongoing:
>
> Handwriting samples have been requested from six to eight police department officials—including Chief Wil-

liam Hart—who have or had the power to endorse checks from the fund.

> The grand jury request came after some secret service fund signatories told investigators they believed their signatures had been forged.

Schaefer, *Police probe looks at writing: Grand jury collects samples to check for signs of forgery,* Detroit Free Press, July 14, 1990, at 3A.

 These news reports warrant further investigation. They reveal (1) the scope and direction of the grand jury investigation; (2) testimony before the grand jury; (3) actions before the grand jury; (4) the identity of witnesses called to testify before the grand jury; (5) the actions of the grand jury; and (6) what has and what will occur before the grand jury. Singularly and cummulatively, they point to a possibility that a federal official or officials subject to the Rule 6 prohibition are disclosing some of the information upon which the articles are based. As *Lance* emphasized, news articles do not, and are not expected to, identify the precise source of the information. Thus, inferences must be drawn from phrases such as "people familiar with the federal probe," "federal officials," "an official familiar with the probe," "officials close to the jury's activities," "government officials familiar with a federal probe," and "law enforcement officials."

 The government has rebutted many of the petitioners' Rule 6 allegations by showing that (1) some of the information reported was inaccurate and (2) City employees were responsible for much of the information that had been revealed by early news stories.[32] In addition, this Court is cognizant of the multiple and concurrent investigations by City, County, State, and Federal officials of the matters underlying the grand jury investigation, the net result of which is that numerous individuals, many of whom are not subject to Rule 6(e)(2),[33] have access to information

---

**32.** An unrebutted affidavit by a federal agent indicates that Chief Hart acknowledged that some of his police officers were responsible for revealing information to the news media, resulting in their transfer to other positions.

**33.** Wayne County (Michigan) Circuit Court Judge Marvin Stempien, however, has issued a protective order in state court which also covers the disclosure of information connected to this matter. *See* City of Detroit's Motion for Sanctions (4/26/90), Attachment E.

and documents that ultimately may be presented to the grand jury.

Nevertheless, the government's arguments and affidavits do not persuade this Court that the inquiry should end. What is troubling is that these reports raise the specter of public corruption as a matter of fact when the grand jury has not yet spoken by way of indictment. After scrutinizing the wealth of information that has been submitted, this Court can only conclude that the person or persons responsible may be ensconced within the federal government.

Grand jury disclosures represent a pernicious evil that are virtually impossible to deter, if not detect, in practice. If "a drop of acid gossip suffices to curdle a reputation irrevocably," *The Selected Writings of Judge Jerome Frank* 4 (1965), it takes no imagination to realize the harm done from a leak, much less continuous leaks, of grand jury matters.[34]

■ Consequently, vigorous investigation and enforcement of Rule 6(e)(2) violations will be the rule, not the exception. It is the intention of the Chief Judge of this Court to read Rule 6 broadly and to punish violators accordingly, instilling in those persons who are subject to its strictures the command that their legitimate channels of communication are narrow rather than wide and that they should err on the side of silence.

The Office of Professional Responsibility of the Department of Justice is ordered to investigate *all* the articles mentioned in

this Order (including the Isiah Thomas matter), even though many of them do not evince violations of Rule 6, and report to this Court, in camera, its findings on or before December 21, 1990. The report should be directed to whether a federal source disclosed matters occurring before the grand jury and, if so, the identity of the source or sources. *See Matter of Archuleta*, 432 F.Supp. at 599. The United States Attorney's Office shall provide the Department of Justice officials with the pleadings in this matter as well as with a copy of this Order.

This Court may conduct, either before or after the Department of Justice Report, its own investigation of some of these matters. It is the intention of this Court to utilize the full range of its authority, under Federal Rule of Criminal Procedure 6(e)(2), Local Rule 11, and its supervisory powers, to address this matter.

## VII.

■ The proceedings in this matter have been conducted under seal, though not with complete success.[35] After further thought, this Court sua sponte raises the issue of whether this Order should be unsealed. Not every pleading, proceeding, or order should be under seal without sufficient thought given to, and findings made upon, the respective interests involved. *See Application of National Broadcasting Company, Inc. and WKYC–TV3*, 828 F.2d 340 (6th Cir.1987); *see also Cincinnati Gas and Elec. Co. v. General Elec. Co.*, 854 F.2d 900, 902–04 (6th Cir.1988) (first

---

**34.** In this vein, attention should be brought upon another possible Rule 6 violation in this district which is of concern to this Court, the so-called "Isiah Thomas Gambling Investigation." On June 15, 1990, WJBK–TV (Channel 2) Investigative Reporter Vince Wade reported in relevant part:

The federal grand jury gambling investigation has now added some Isiah Thomas checks to its list of potential evidence. Isiah Thomas allegedly wrote several large checks last November at Shoppers' Market in Centerline. *Those checks have been subpoenaed by the federal grand jury.* The owner of Shoppers' Market, Emmet Denha, is also under investigation in the grand jury probe of the Hilf gambling case.

See also Farrell, Lengel & Sinclair, *I don't deserve this,* The Detroit News and Free Press, June 17, 1990, at 1A; Clements, *Conyers wants inquiry into Thomas leak,* Detroit News, June 22, 1990, at 2A; McCallum, *Thorns in the Roses,* Sports Illustrated, June 25, 1990, at 32.

**35.** On May 3, 1990, the Detroit News reported that a "motion to crack down on suspected grand jury leaks" had been filed.

According to private attorneys familiar with the corruption probe, city attorneys filed the motion with Chief U.S. District Court Judge Julian A. Cook, who then sealed it to prevent the motion from being made public.

Farrell & Wark, *Lawyers seek venue change in Weiner's trial,* Detroit News, May 3, 1990, at 1B.

amendment right to access does not include access to summary jury trial); *United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986) (common law right to inspect and copy public records and documents, including tape recordings); *In re Knoxville News–Sentinel Co., Inc.*, 723 F.2d 470 (6th Cir.1983).[36] This area of the law touches upon constitutional and common law issues of the right of access to documents at the preliminary stages of a criminal investigation.

 Although each submission has been reviewed by this Court prior to signing each individual seal, this Court has not made explicit findings which support each seal. However, the submissions in this matter shall remain sealed because of the grand jury rule of secrecy and because the submissions explicitly or implicitly reveal matters occurring before the grand jury. In drafting this Order, the Court has endeavored to avoid revealing confidential grand jury matters or matters that have not already been widely reported in the press. Given (1) the possible "significant positive role" the public may play in such a proceeding, (2) the possible "tradition of accessibility" to such a proceeding, 828 F.2d at 344–45; *Barry*, 865 F.2d at 1326; *Lance*, 610 F.2d at 220–21, and (3) the common law tradition of access to the records of a court, the parties shall have until September 28, 1990 to file any objection to this Court unsealing this Order.

## ADDENDUM

 On September 26, 1990, the government filed an objection to the unsealing of this Order, contending that it explicitly discusses "matters occurring before the grand jury," the evil to which Rule 6 is directed. The government also maintains that the Order implicitly reveals "matters occurring before the grand jury." In support of its objection, the government refers to six items with which it is concerned. The petitioners do not object to the unsealing of the Order.

The government does not address, and presumably does not dispute the applicability of, the Sixth Circuit authority on this issue to which this Court has referred. *See supra* Section VII. In particular, the government does not refute (1) the significant positive role that the public may play in such an important matter, (2) the tradition of accessibility to such a matter, and (3) the common law tradition of access to the records of a court.

Before conducting its own analysis of these issues, the Court emphasizes that Sixth Circuit precedent applies a presumption of openness and access "to documents filed in a district court at the preliminary stages of a criminal prosecution," *Application of NBC*, 828 F.2d at 343, 347, whether on the basis of the first amendment or the common law. The government has not overcome this presumption.

Although there are circumstances in which the record and documents pertaining to Rule 6 allegations should be sealed from public view,[37] there are a number of reported cases in which the allegations are aired on a public record. *See, e.g., Barry, Blalock, Eisenberg, Lance, In re Grand Jury Investigation*, No. 87–0163 (E.D.N.Y. Feb. 23, 1987) (available on Westlaw, 1987 WL 8073). *But see In re: A Grand Jury Investigation*, Misc. No. 87–0206 (under seal) (D.D.C. July 28, 1987), *aff'd*, 865 F.2d 392 (D.C.Cir.1989). Thus, the tradition is that Rule 6 allegations and proceedings are accessible subject, of course, to those matters that would contravene Rule 6 if disclosed. *See Application of NBC*, 828 F.2d at 346

---

**36.** The Court notes Judge Ryan's dissenting opinion in *Application of NBC*, 828 F.2d at 347–54, in which he distinguishes between the right of access to (1) court documents and records and (2) court proceedings. In Judge Ryan's opinion, the right of access to court documents and records is derived from the common law, if anything, while the right of access to court proceedings is derived from the first amendment. There have been no "proceedings" in this matter, and the Court is concerned at this time only with the unsealing of this Order.

**37.** For example, as in this case, some of the documentation in support of and in opposition to the Rule 6 allegations must be sealed because they contain "matters occurring before the grand jury," the disclosure of which would possibly violate Rule 6 in some circumstances.

(citing *Associated Press v. United States District Court,* 705 F.2d 1143, 1147 (9th Cir.1983) and referring to unsealing records unless specific findings made on a document-by-document basis).

Public access to this Order would play a significant positive role in this matter. "The first amendment right of access is, in part, founded on the societal interests in public awareness of, and its understanding and confidence in, the judicial system." *Id.* (quoting *United States v. Chagra,* 701 F.2d 354, 363 (5th Cir.1983)). In light of the public and private interests that are intertwined with Rule 6, *Douglas Oil,* 441 U.S. at 219, 99 S.Ct. at 1672, allegations that the rule has been violated should not be kept from public knowledge. Moreover, the manner in which the allegations are treated is critical to insure public faith in the American system of criminal justice. The multitudinous media reports about this purported investigation inculcate this Court with the firm conviction that this Order should be unsealed. "Openness in judicial proceedings promotes public confidence in the courts." *Application of NBC,* 828 F.2d at 347.

This Court disagrees with the government's concerns that this Order explictly and implicitly reveals matters occurring before the grand jury. First, this Court has specifically refrained from placing its imprimatur upon the allegations in this matter.[38] Second, this Court has specifically "endeavored to avoid revealing confidential grand jury matters or matters that have not already been widely reported in the press." Moreover, this Court has qualified much of the language in the Order with terms such as "purported," "alleged," or "contended." Thus, by reiterating but not recognizing a particular party's position, this Court is not revealing "matters occurring before the grand jury." In addition, since a grand jury witness is not subject to the secrecy provisions of Rule 6, he and his

attorney could reveal grand jury matters to the public and to a court via a pleading.

After reviewing each of the six areas in which the government contends that the unsealing of this Order would contravene Rule 6, this Court is satisfied that it has avoided any affirmative recognition of a matter occurring before the grand jury. More important, it has balanced the competing interests contained in Rule 6, the first amendment, and the common law. The right of access to this Order holds sway.

Accordingly, this Amended Order shall not be filed under seal.

IT IS SO ORDERED.

---

**38.** For example, in the Order this Court disavowed any intention to recognize purported facts: "Unless explicitly stated, nothing in this opinion is meant to be, or should be construed as, a finding or findings of fact. This back-

ground information has been culled from the submissions of counsel, most of which contain disputed allegations and arguments, the resolution of which is unnecessary to the disposition of the motions." *See supra* note 6.